## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

**ALBERT BUSTILLOS,**

       **Plaintiff,**

**v.**                                   **No. 2:20-cv-01060-JCH-GJF**

**THE CITY OF ARTESIA and OFFICER**
**DAVID BAILEY,**

       **Defendants.**

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
### AND MEMORANDUM IN SUPPORT

    **COME NOW** Defendants, by and through their counsel of record, Atwood, Malone, Turner & Sabin, P.A., by Bryan Evans and K. Renee Gantert and, pursuant to Federal Rule of Civil Procedure 56, hereby move the Court for entry of an order granting them summary judgment, based upon qualified immunity, on all of Plaintiff's claims against them and dismissing Plaintiff's Complaint with prejudice. As grounds therefor, Defendants state:

    1.    As set forth more fully below, there is no genuine dispute as to any material fact concerning the applicability of the doctrine of qualified immunity to the actions of Defendants or their entitlement, therefore, to summary judgment.

    2.    As set forth more fully below, Defendants are entitled to judgment s a matter of law.

# I.

# INTRODUCTION

This lawsuit arises out of Defendant Corporal David Bailey's arrest of Plaintiff Albert Bustillos on September 11, 2018 for concealing his identity in violation of Section 30-22-3 of New Mexico's criminal code.  Plaintiff alleges that Corporal Bailey violated the Fourth Amendment's requirement that he have reasonable suspicion to demand identification, as well as its requirement that officers have probable cause to make an arrest. Plaintiff further contends that Corporal Bailey's actions violated the Fourth Amendment.  In addition to his federal Constitutional Claims, Plaintiff also asserts state law claims against both defendants.

Corporal Bailey first encountered Plaintiff on September 11, 2018, after he was dispatched to the Navajo Refinery in Artesia, New Mexico to respond to a report of a "suspicious person" filming the facility.  In addition to being provided with other details, Corporal Bailey was given a description of the Plaintiff.  When he arrived on scene, he found a male subject on foot, who fit the description given, and who was actively filming from a handheld camera rig while arguing with Corporal Bailey's partner, Corporal Marcie Sanchez.  The male subject, of course, turned out to be Plaintiff.  As he approached the pair, Corporal Sanchez advised Corporal Bailey that Plaintiff was refusing to identify himself.  When Corporal Bailey pointed out that this was an arrestable offense, Plaintiff began arguing with him as well.  Corporal Bailey tried to explain the basis for demanding Plaintiff's identification, but Plaintiff interrupted him, arguing his belief that he did not have to produce identification, and berating Corporal Bailey for suggesting otherwise.  Corporal Bailey was finally able to make one last clear demand for Plaintiff's identification, to which Plaintiff firmly responded that he would not provide identification.  At this point, Corporal Bailey arrested Plaintiff for refusing to identify himself.

Corporal Bailey is entitled to summary judgment on Plaintiff's Constitutional claims. Plaintiff cannot demonstrate that Corporal Bailey violated any of his rights under the United States Constitution and even if he could, he could not establish that any such violation was clearly established by existing precedent. Plaintiff's state law claims are subject to dismissal as well. They require Plaintiff to show that Corporal Bailey arrested him without probable cause. Because Plaintiff cannot make this showing, Corporal Bailey, along with the City of Artesia, are also entitled to summary judgment on Plaintiff's state law claims.

## II.

### STATEMENT OF UNDISPUTED MATERIAL FACTS

1.       On September 11, 2018, Plaintiff Albert Bustillos travelled to the Navajo refinery in Artesia, New Mexico. *Plaintiff's Complaint, ¶¶ 8-9, attached hereto as Exhibit 1.*

2.       Plaintiff parked his van at a restaurant on Main Street, then crossed the highway and walked over to Navajo.  *Plaintiff's Deposition, 80:21-81:25, attached hereto as Exhibit 2.*

3.       Plaintiff carried with him a camera setup that included his cell phone, a stabilizer device, a Nikon camera, and a battery back. *Ex. 2, 109:16-110:24.*

4.       After arriving at the refinery, Plaintiff was approached by one of its security guards, Benito Martinez. *See Ex. 1, ¶ 10.*

5.       At this point, Plaintiff began livestreaming to his own personal YouTube Channel. *Ex. 2,* 128:20—129:13; *see also Livestream from Plaintiff's YouTube channel, dated September 11, 2018, starting at 0:00, attached hereto as Exhibit 3.*

6.       After their encounter, Plaintiff went on his way, walking next to the refinery while filming it. *Ex. 3, starting at approximately 7:33.*

7.       After Plaintiff departed, security guard Martinez called 911 and reported that a male

subject was filming the refinery. *Ex. 1, ¶ 22; APD Dispatch Call Log, attached hereto as Exhibit 4.*

8.      Martinez reported that the subject was on foot, outside the fence, but filming the inside of the refinery and, later, employee's vehicles. *Ex. 4.*

9.      Martinez described the subject as wearing a brown shirt, blue Levi shorts, and a fisherman's hat. *Id.*

10.     Corporal David Bailey of the Artesia Police Department was dispatched to the Refinery.  *Id.*

11.     The dispatcher told Corporal Bailey that the call was "in reference to a suspicious person" at Navajo refinery, that the reporting party was standing by and was one of the Refinery's security guards, and that the reporting party had stated "the male subject [was] standing outside of the fence, however [was] filming in towards the refinery yard." *Dispatch to Corporal Bailey No. 1, attached hereto as Exhibit 5; see also Ex. 4.*

12.     The dispatcher then relayed that the subject was "gonna be on foot" and relayed Martinez's report that he was also filming employee's vehicles.  *Dispatch to Corporal Bailey No. 2, attached hereto as Exhibit 6.*

13.     The dispatcher provided Corporal Bailey the description of Plaintiff that Martinez had given. *Id.*

14.     Corporal Marcie Sanchez heard the dispatch and decided to respond to the refinery. *Deposition of Marcie Sanchez, 5:1-6, attached hereto as Exhibit 7.*

15.     When she arrived, she observed the male that dispatch had described speaking with what looked to her like a Navajo employee, so she walked over to the male. *Id. 5:24—6:3; see also Ex. 3 at approximately 21:15.*

16.     Corporal Sanchez asked Plaintiff for his ID.  He refused to provide it and began arguing with her about his belief that he "had to have broken the law" in order for her to make a lawful demand for his ID and about his right to film the refinery from public property. *Ex. 3 from approximately 21:33 to 23:49.*

17.     In the meantime, Corporal Bailey had arrived on scene and observed a male who was arguing with Corporal Sanchez while he filmed with his handheld camera rig and who fit the description dispatch had given of the subject in question. *Incident Report by Corporal Bailey, p. 6, attached hereto as Exhibit 8; Deposition of Corporal Bailey, 43:2-13, attached hereto as Exhibit 9.*

18.     When Corporal Bailey arrived, two Navajo employees were present. *Partial Transcript of Proceedings in State District Court, 6:20-25; 11:11-20, attached hereto as Exhibit 10.*

19.     As Corporal Bailey approached the pair, Corporal Sanchez advised him that Plaintiff was refusing to identify himself. *Ex. 3 at approximately 23:48.*

20.     Corporal Bailey pointed out that Plaintiff's refusal to identify himself is an arrestable offense, at which point Plaintiff chimes in that he has to have been "committing a crime to have - give ID." *Ex. 3 at approximately 23:51.*

21.     Corporal Bailey and Plaintiff then have the following exchange:

B(ailey):       No sir.

P(laintiff):    Yes, I do! Yes I do, wanna bet?

B:              Yes, sir.

P:              You have to articulate a crime that I have either committed, am committing, or am about to commit.

B:              No, sir. No. sir. No, sir.

5

P:        Wanna bet?

B:        Yes, sir.

P:        Aright, you better call your supervisor before you do something stupid.

B:        Okay. We were called here-

P:        It don't matter. You can call, and you can come, and you can come investigate.

B:        As part of a legal call. As part of that you are the suspect- you are the suspect we were called here to deal with. Therefore, you are required to-

P:        No, I'm not. Suspicion isn't a crime. Suspicion isn't a crime. It's not a felony or a misdemeanor.

B:        It's not a matter of whether there's a crime.

P:        Yes it is. Yes it does! That is the law, you have to articulate a crime I've committed. . . I don't have to give nothing unless I've committed a crime.

B:        Right now, the crime you are committing is failure to identify-

P:        No, no, no that can't be the first crime, unless I've committed one. *Then* you can get me for refu- for failure. Until then, just for me walking on the sidewalk it's not permissible for me to give you ID. I don't have to give nothing unless I've been- committed a crime. You better go back and read up the law.

B:        Well for one, you are. . . on federally protected property-

P:        I can film *aallll* I want. Look, *aallll* of it, everything.

B:        It's posted. It's clearly posted.

P:        It don't matter if its posted. That's not the law. Do you see a penal code under the sign? No. If it was a law, there would be a penal code. I'm not on their property. Those laws, those rules don't apply to me unless I'm on their property law. I'm

6

on public access, that means I'm a free citizen-

B:        That doesn't matter.

P:        It does matter. You're ignorant if you don't know the law! You got that badge and that gun, but you don't even know. How you gonna enforce something when you don't even know-

*Ex. 3 from approximately 3:52 to 25:16.*

22.      At this point in the conversation Corporal Bailey tried to ask Plaintiff if he had his ID, but Plaintiff continued to talk over him about his right to film the property. *Ex. 3 at approximately 25:17.*

23.      Bailey finally raised his voice enough to get out his question, asking "Do you have your ID?" to which Plaintiff firmly responded, "I'm not giving you my ID." *Ex. 3, at approximately 25:18.*

24.      Having made clear again that he was not going to identify himself, Corporal Bailey arrested Plaintiff on that basis. *Ex. 3 at approximately 25:19.*

25.      The fact that it was the anniversary of the 9/11 terrorist attacks was something Officer Bailey had in mind, as it is a day when officers are on heightened alert to watch for anything out of the ordinary. *Ex. 9, 50:4-51:3.*

26.      In Corporal Bailey's experience, Plaintiff's behavior "definitely was" out of the ordinary. *Ex. 9, 51:2-3.*

27.      In over five years with the Artesia Police Department, it was Corporal Bailey's experience that "it is not common to see persons on foot walking around the perimeter, the borders of the Navajo Refinery, at any time of day" and "videotaping [it] for reasons unknown". *Ex. 10, 10:10-21; see also Ex. 9, 25:6-13 (recounting how Plaintiff "was walking along in a place where we don't normally ever have any foot traffic and was videotaping a federally protected facility for*

*reasons unknown"*) and *42:23—43:8* (*testifying that he saw an immediate need to act given it's not normal to "have people, either pedestrian traffic or for that matter filming, that [are] - enough with the staff enough to call [police] there."*).

28.     Corporal Bailey's evaluation of Plaintiff's behavior was further informed by the fact that it was alarming enough to Navajo security staff that they felt it necessary to call law enforcement. *Ex. 9, 25:7-10; 42:23—43:8; see also Ex. 10, 10:22-25.*

29.     Because law enforcement was called, Corporal Bailey inferred that Plaintiff had been confrontational with Navajo employees when confronted about his filming. *Ex. 9, 44:1-8.*

30.      At the time of Plaintiff's arrest, Corporal Bailey was under the impression that Navajo Refinery's property line extended all the way to the curb. *Id., 24:18—25:5.*

31.     Corporal Bailey was not alone in his understanding of the property lines. One Navajo refinery employee that interacted with Plaintiff prior to Corporal Sanchez and Corporal Bailey's arrival specifically told him that the refinery owned "all the way to the curb." *Ex. 3 at approximately 17:43.* Another employee who had driven up alongside Plaintiff in a red truck marked "Navajo Safety" told Plaintiff that the refinery's property went up to the jersey barricades and that the utility poles which Plaintiff insisted were "public easement" were actually on Navajo property. *Id. at approximately 20:33.*

32.     At the time of Plaintiff's arrest, Corporal Bailey had the understanding that Navajo Refinery was a federally protected facility. *See Ex. 9, 25:6-13.*

33.     Navajo refinery is the largest refinery in New Mexico, capable of producing 100,000 barrels of refined product per day. *Navajo Refinery, New Mexico*, THE CENTER FOR LAND USE INTERPRETATION, https://clui.org/ludb/site/navajo-refinery (last visited June 25, 2021).

34.     Navajo refinery serves markets across the southwestern United States and northern

Mexico. *Id.*

35.     As a refinery, Navajo refinery is part of the energy sector—a "uniquely critical" infrastructure sector that "provides an 'enabling function' across all [other] critical infrastructure sectors." *Energy Sector,* CYBER & INFRASTRUCTURE SECURITY AGENCY*, https://www.cisa.gov/energy-sector* (last visited June 30, 2021); *see also Energy Sector-Specific Plan,* CYBER & INFRASTRUCTURE SECURITY AGENCY, https://www.cisa.gov/sites/default/files/publications/nipp-ssp-energy-2015-508.pdf, *also attached hereto as Exhibit 11,* p. 3, (explaining that the Energy Sector is "divided into three interrelated segments or subsectors—electricity, oil, and natural gas—to include the production, refining, storage, and distribution of oil, gas, and electric power. . . ." ).

36.     The nation's security and economy depend on reliable supply of energy. *Ex. 11,* p. 26.

37.     Despite its importance to the nation's wellbeing, the energy sector is mostly owned and operated by the private sector. *Id.* at 26.  Thus, "[i]n the Energy Sector, critical infrastructure security and resilience goals and priorities are developed and achieved through a collaborative effort between the industry and the government." *Id. at p. 13, 26.*

38.     A key risk facing the oil and natural gas industry is the potential for "disruption due to political instability, civil unrest, or terrorist activities." *Id.* at p. 5.

39.     Photographing and/or filming infrastructure is something the federal government has specifically singled out as an indicator of suspicious activity. *See* Jonathan Peters, *Homeland Security photography alert is 'a seed of fear',* COLUMBIA JOURNALISM REVIEW, July 12, 2018, https://www.cjr.org/united_states_project/homeland-security-photography-warning.php        (last visited June 30, 2021) (discussing a July 9, 2018 Twitter Post from the Department of Homeland

Security that stated "photography and surveillance could be a sign of terrorism-related suspicious activity"), *also attached hereto as Exhibit 12*; *see also* Office of the Director of National Intelligence, *JCAT Counterterrorism Guide for Public Safety Personnel*, https://www.dni.gov/nctc/jcat/index.html (last visited June 30, 2021) (listing photography as an indicator of suspicious activity), *also attached hereto as Exhibit 13, pp. 8-9.*

40.     The concern is that photography has played a role in surveillance and planning for past terrorist attacks and oil and gas facilities are prime targets for future attacks. Gal Luft and Anne Korin, *Terror's Next Target,* The Journal of International Security Affairs, Dec. 2003 (explaining that terrorist organizations "have always been interested in targeting oil and gas facilities", that the interest escalated post-9/11, and that an "attack on [a] major oil installation, a chokepoint or a pipeline hub would be detrimental to America's economy and likely to affect every aspect of our lives"), http://www.iags.org/n0111041.htm (last visited June 30, 2021).

### III.

### QUALIFIED IMMUNITY AND SUMMARY JUDGMENT STANDARD

The summary judgment rule is designed to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24, 106 S. Ct. 2548 (1986). Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In a typical case, the movant bears the initial burden of showing that the motion satisfies this standard. Defendants in civil cases can meet their burden "either by producing affirmative evidence negating an essential element of the [Plaintiff's] claim, or by showing that the [Plaintiff] does not have enough evidence to carry its burden of persuasion at trial. *Trainor v. Apollo Metal Specialties, Inc.,* 318 F.3d 976, 979 (10th Cir. 2012); *see also Celotex,* 477 U.S. at 325.

Officials sued under 42 U.S.C. §1983 are entitled to qualified immunity unless they have "violated a statutory or constitutional right that was 'clearly established' at the time of the challenged conduct." *Plumhoff v. Rickard,* 172 U.S. 765, 778, 134 S. Ct. 2012, 188 L. Ed. 2d 1056 (2014) (internal citation omitted).  "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985) (emphasis deleted)). Qualified immunity protects "all but the plainly incompetent or those that knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

An official is entitled to qualified immunity unless the unlawfulness of his conduct in the particular circumstances before him was clearly established at the time of the conduct.  *Wesby,* 138 S. Ct. 577, 589-90, 199 L. Ed. 2d 453 (2017); *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).  "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. . . . It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Wesby,* 138 S. Ct. at 589-90.  In other words, the unlawfulness of the official's conduct must be beyond debate in light of existing law. *City of Escondido v. Emmons,* 139 S. Ct. 500, 504, 202 L. Ed. 2d 455 (2019) (*per curiam*) (internal quotation marks omitted). Furthermore, the protection of immunity is not lost "when an official reasonably makes a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson,* 555 U.S. at 231.

 The Supreme Court has "repeatedly told courts. . . .not to define clearly established law at a high level of generality". *Ashcroft v. al-Kidd,* 563 U.S. 731, 742 (2011). "[D]oing so avoids the

crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff,* 172 U.S. at 779. The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004) (*per curiam*) (quoting *Saucier v. Katz,* 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)). "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine. . . will apply to the factual situation the officer confronts.'" *Mullenix v. Luna,* 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015) (quoting *Saucier,* 533 U.S. at 205).

## IV.

## ARGUMENT AND AUTHORITY

### A. Corporal Bailey is Entitled to Qualified Immunity on Plaintiff's Fourth Amendment Claims

Plaintiff's Fourth Amendment claims rise and fall on whether Corporal Bailey possessed reasonable suspicion to demand Plaintiff's identification. If Corporal Bailey lacked reasonable suspicion, then it was not lawful for him to arrest Plaintiff when he failed to produce that identification. If, on the other hand, Corporal Bailey had reasonable suspicion to demand Plaintiff's identification, he was justified in arresting Plaintiff for concealing his identity when Plaintiff made clear he would not produce identification.

### 1. Corporal Bailey had Reasonable Suspicion to Demand Plaintiff's Identification

"[A]n officer may not arrest someone for concealing identity without 'reasonable suspicion of some predicate, underlying crime.'" *Mocek v. City of Albuquerque*, 813 F.3d 912, 922 (10th Cir. 2005). Courts "look to the 'totality of the circumstances' to determine whether there was

reasonable suspicion of wrongdoing." *Id.* at 923. "[T]he likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). "The question is 'whether the facts available to the detaining officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate.'" *Mocek*, 813 F.3d at 923.

"Reasonable suspicion is not, and is not meant to be, an onerous standard." *United States v. Simpson,* 609 F.3d 1140, 1153 (10th Cir. 2010).  "[I]t exists so long as the circumstances would justify a reasonable officer in stopping a person to 'verify or dispel the officer's suspicion in a short period of time.'" *Romero v. City of Clovis,* No. 1:17-cv-00818-PJK-GBW, 2019 U.S. Dist. LEXIS 91806, at *9 (D.N.M. May 31, 2019) (citing *Florida v. Royer,* 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)). Further, it "may exist even if it is more likely than not the individual is not involved in any illegality." *United States v. McHugh*, 639 F.3d 1250, 1256 (10th Cir. 2011).

In this case, Corporal Bailey was dispatched to Navajo refinery to respond to a report by its security guard that a "suspicious person" was "standing outside the fence," but "filming in towards the refinery yard." *UMFs* 10-11.  The dispatcher advised Corporal Bailey that the reporting party was a Navajo security guard who stated the subject was on foot and was wearing a brown shirt, Levi shorts, and a fisherman's hat. *UMFs 9, 12, 13.*

When he arrived on scene, he found his partner, Corporal Sanchez, arguing with a male subject who was filming with a handheld camera rig and who matched the description dispatch had provided. *UMF 14-17.* Corporal Sanchez advised Corporal Bailey the subject was refusing to identify himself. *UMF 19.* By itself, a person filming a building may not seem all that suspicious, but in this case, Corporal Bailey's experience was that such behavior was highly unusual. *UMFs*

*26-27.*   Not only was the behavior unusual, there were other factors at play that reasonably heightened Corporal Bailey's level of suspicion and justified further investigation. Those factors are that 1) it was the anniversary of the 9/11 terrorist attacks—something Corporal Bailey specifically had in mind, 2) the building was a refinery—the state's largest refinery, in fact, and a facility Corporal Bailey understood to be (and that *is*, in some sense) "federally protected", and 3) Navajo's own employees found the behavior alarming enough that a security guard reported it to police and at least two employees were on scene when Corporal Bailey arrived. *UMFs 18, 25, 28-29, 32-37.*   Given these circumstances, the Court should find that reasonable suspicion justified Corporal Bailey's demand for Plaintiff's identification.

Defendants have not located a case in the Tenth Circuit with facts much like those at issue here. The most instructive case is *Mocek v. City of Albuquerque,* 813 F.3d 912.  There, Mr. Mocek had gone to the airport for a flight and given his driver's license—his only form of photo I.D.—to a travel companion, who went through security before he did. *Id.* at 920.  At the security podium, Mr. Mocek gave the TSA agent his boarding pass, but told him he did not have identification.  *Id.* He was then directed to a different line, where another agent began an alternative identification procedure that entailed asking Mocek for other proof of identity, such as a credit card. *Id.* When Mocek did not comply the agent told him to he would contact TSA's security Operations Center and that if the Center could not verify Mocek's identity, he would not be allowed through the checkpoint. *Id.*

Believing the procedures were "atypical", Mr. Mocek began filming the encounter.  *Mocek,* 813 F.3d at 920.  The agent ordered him to stop and when Mr. Mocek persisted, the agent summoned police for assistance.  In the meantime, TSA agents attempted to grab the camera from Mr. Mocek, who "remained calm, but continued to record and would not identify himself." *Id.*

When the police arrived, the TSA agents advised them that Mr. Mocek was "causing a disturbance", would not put down his camera, and was taking pictures of all the agents. *Id.* One officer warned Mocek if he did not comply, he would be escorted out of the airport. *Id.* Another officer threatened to arrest Mocek, but he continued to film and insist he was in compliance with TSA regulations. *Id.* One of the officers began to usher Mocek out of the airport, but having heard from another officer that Mocek refused to show his identification, the officer stopped and asked to see Mocek's ID. *Id.* The officer told Mocek he could be arrested if he did not present ID. *Id.* Mocek responded that he did not have any identification on him. *Id.* at 921. At this point, the officer said Mocek was under investigation for disturbing the peace and was required to present identification. *Id.* Mr. Mocek declared he would remain silent and wanted to speak to an attorney. *Id.* The officer arrested him. *Id.* Mocek was charged with disorderly conduct, concealing name or identity, resisting a lawful command and criminal trespass. *Id.* He was acquitted on all counts at the subsequent criminal trial. *Id.* Mocek subsequently sued for violation of his First and Fourth Amendment rights. *Id.*

The District Court held, and the Tenth Circuit agreed, that the officers were justified in stopping Mocek on reasonable suspicion of disorderly conduct. *Mocek,* 813 F.3d at 923. In reaching its conclusion, the Tenth Circuit emphasized "the uniquely sensitive setting [it] confront[ed]", acknowledging that "[o]rder and security are of obvious importance at an airport security checkpoint." *Id.* at 924 (citations omitted). The sensitive nature of a location is significant in that "conduct that is relatively benign elsewhere might work to disturb the peace at these locations." *Id.* "From a reasonable officer's perspective, Mocek's filming may have invaded the privacy of other travelers or posed a security threat. . . .The possibility that he had malign intentions raised the likelihood that his conduct would comprise orderly operations at the checkpoint." *Id.* As

the Tenth Circuit saw it:

> the information available to [the arresting officer] indicated that Mocek had distracted multiple TSA agents, persistently disobeyed their orders, already caused a "disturbance" (according to the agents on the scene), and potentially threatened security procedures at a location where order was paramount. Under these circumstances, a reasonable officer would have had reason to believe, or at least investigate further, that Mocek had committed or was committing disorderly conduct.
> *Mocek, 813 F.3d at 924.*

Just like the airport security checkpoint at issue in *Mocek*, the oil refinery Plaintiff was filming in this case is unquestionably a sensitive location at which order and security are paramount. As the largest oil refinery in the state serving markets across the southwestern United States, it is part of the energy sector—an infrastructure sector the federal government considers "uniquely critical" because it "provides an 'enabling function' across all [other] critical infrastructure sectors" and because the nation's security and economy depend on a reliable supply of energy. *UMFs 33-36.* A key risk facing the oil and gas industry is the potential for disruption due to political instability, civil unrest, or terrorist activities. *UMFs 37-38.* Accordingly, photographing and/or filming of oil and gas refineries is something the federal government has specifically singled out as suspicious activity. *UMFs 39-40.*

The heightened need for order and security at an oil refinery is important *every day,* but if there is ever an occasion to be on even higher alert, it is the anniversary of the 9/11 terrorist attacks. Corporal Bailey was not ignorant of the significance of the location and the date—he understood the refinery to be a federally protected facility and was aware of and mindful of the fact it was the anniversary of 9/11. *UMFs 25, 32.* Moreover, the dispatcher specifically informed him he was responding to Navajo in reference to a report by one of its security guards of a "suspicious person" who was filming "in towards the refinery yard." *UMF 11.* Other similarities between this case and *Mocek* include the fact that, like the officers in that case, the information available to Corporal

16

Bailey was that Plaintiff had distracted at least two Navajo employees,[1] had refused to identify himself, and had been confrontational with both Corporal Sanchez and, Bailey presumed, Navajo employees. *UMFs 17-19, 29.*   When Officer Bailey arrived, Plaintiff continued to be confrontational with him. He argued that he did not have to identify himself and continually interrupted and berated Officer Bailey when he tried to explain his justification for demanding Plaintiff's identification. *UMF 20-21.*

The case most factually similar to the case at bar in *any* federal court is *Smith v. Hernandez,* 2020 U.S. Dist. LEXIS 58005 (N.D. Tex. Apr. 1, 2020). There, the plaintiff alleged he was standing on a public sidewalk taking pictures of routine flaring at a pipeline plant in Southlake, Texas. *Id. *1.* Someone called 911 and reported there was a suspicious individual photographing the facility. *Id. at *1-2.*  The caller never stated that the plaintiff had trespassed onto the property. *Id.* at *2. The officer who investigated the tip approached the plaintiff and incorrectly stated he was responding to a 911 call about an individual going through a gate at the facility, which the plaintiff denied. *Id.* When the plaintiff refused to identify himself on the grounds that the officer lacked a legal basis for the detention, the officer handcuffed him while he contacted the 911 caller, who clarified the plaintiff did not go behind the gate. *Id.* Next, the officer opened the plaintiff's backpack without his consent, removed his wallet, and used the driver's license therein to identify the plaintiff. *Id.*  After being told by dispatch the plaintiff was clear of any warrants, the officer removed the handcuffs and released him. *Id.*

The Court concluded the defendant-officer was entitled to qualified immunity because a "reasonable officer could believe that reasonable suspicion of terrorist activity existed under a totality of the circumstances." *Smith,* 2020 U.S. Dist. LEXIS 58005, *14-15. "First, the nature of

---

[1] By Plaintiff's own count, the number is actually higher.  He testified that he interacted with four Navajo employees. *Ex X, 105:16-20.*

the facility makes it a potential terrorist target because the jet fuel there is highly flammable." *Id.* at *15. "Second, a gas pipeline in Plano, Texas was subject to an attempted lone-wolf attack in 2015." *Id.*  "Third, a 911 call reported a suspicious individual taking photographs of the facility." *Id.* "Finally, the individual matching the 911 caller's description refused to identify himself when asked by police." *Id.*

The facts in this case are remarkably similar to those in *Smith.* Both plaintiffs were using a camera to capture images of a facility connected to the oil and gas industry.  The officers in both cases were advised they were responding to a report of a suspicious individual and in both cases, the officers arrived on scene to find a subject matching the description of the subject given by the reporting party. Though filming or photographing a facility connected to the oil and gas industry is certainly susceptible of innocent explanation, the nature of the facility combined with the photographers' refusal to identify themselves, gives rise to more suspicion than would be justified if the location were different or if the subject had simply produced identification.  The fact that Plaintiff here undertook his activities on the anniversary of 9/11 only heightened Bailey's reasonable suspicion.

It is not clear that Corporal Bailey has to identify a particular crime he suspected Plaintiff of in order to satisfy reasonable suspicion.  In general, reasonable suspicion requires only "some **minimal level of objective justification**", *Immigration & Naturalization Serv. v. Delgado,* 466 U.S. 210, 217 (1984) (emphasis added), that "criminal activity may be afoot." *Terry v. Ohio,* 392 U.S. 1, 30 (1968).  The District Court that first evaluated the claims of qualified immunity at issue in *Mocek* specifically stated that identification of a particular crime was *not* required even in the context of a demand for identification. *Mocek v. City of Albuquerque*, 3 F. Supp. 3d 1002, 1078 (D. N.M. 2014) ("For reasonable suspicion to exist, officers are not required to observe the

18

equivalent of direct evidence of a particular specific crime as long as there is reasonable suspicion of criminal activity. ... Likewise, to establish that reasonable suspicion exists, officers have no obligation to articulate a specific offense which they believe the suspect may have committed."), aff'd, 813 F.3d 912 (10th Cir. 2015). However, assuming for the sake of argument only that identification of a specific crime is required, Officer Bailey not only had reasonable suspicion of disorderly conduct under *Mocek,* and of terrorist activity under *Smith,* he also had reasonable suspicion that Plaintiff was in violation of an Artesia municipal ordinance, and was trespassing. Section 5-1B-3 of Artesia's Municipal Code states:

> It is unlawful for any person to loiter or prowl in a place, at a time, or in a manner not usual for law-abiding individuals under circumstances that warrant alarm for the safety of person or property in the vicinity. . . . Unless flight by the actor or other circumstances makes it impractical, a peace officer shall afford the actor an opportunity to dispel any alarm which would otherwise be warranted, by requesting him to identify himself and explain his presence and conduct. . . .

Here again, Corporal Bailey's experience was that traversing the perimeter of the refinery on foot while filming the facility was out of the ordinary.  *UMFs 26-27.* In addition to his own experience, Corporal Bailey knew the behavior was alarming enough to Navajo personnel that a security guard reported it to law enforcement and at least two employees were called away from their regular duties to deal with the situation. *UMFs 18, 28.*  Such odd behavior was of even more concern than it might have been at some other time and place, given the sensitive nature of the location and the significance of the date. *UMFs 25, 32.* Under these circumstances, Corporal Bailey had reasonable suspicion to suspect Plaintiff of violating the Artesia ordinance.

As for trespassing, the information Corporal Bailey received from dispatch was that Plaintiff was walking outside the fence, but filming inside the refinery yard.  *UMF 11.*  Corporal Bailey had the not unreasonable impression that Navajo owned all the way to the curb. *UMF 30.* Even if mistaken in that regard, the mistake was reasonable and does not defeat reasonable

suspicion. *Heien v. North Carolina,* 135 S. Ct. 530, 536 (2014) ("Reasonable suspicion arises from the combination of an officer's understanding of the facts and his understanding of the relevant law. The officer may be reasonably mistaken on either ground."). Any mistake in his understanding as to Navajo's borders is reasonable, as evidenced by the fact that Navajo's own employees apparently had the same or similar understandings. *UMF 31.*

In short, the particular circumstances Corporal Bailey faced when dispatched to Navajo refinery to respond to a report that a suspicious person was filming the facility gave rise to a reasonable suspicion to believe Plaintiff may have been engaged in criminal activity. Because he had reasonable suspicion, Corporal Bailey was justified in investigating further and demanding Plaintiff identify himself as part of that investigation. Accordingly, Corporal Bailey is entitled to qualified immunity – and thus summary judgment - on Plaintiff's claim he lacked reasonable suspicion to detain Plaintiff and demand his identification.

> **2. Because Corporal Bailey had Reasonable Suspicion to Demand Plaintiff's Identification, he also had Probable Cause to Arrest and prosecute Plaintiff When He Made Clear He Would Not Produce Identification**

Because Corporal Bailey was entitled to demand that Plaintiff identify himself, he was justified in arresting Plaintiff when he refused to do so. *See e.g. Donahue v. Wihongi,* 948 F.3d 1177, 1194 (defendant officer had authority to demand plaintiff's name, and thus, had probable cause to arrest plaintiff for failing to disclose his name as required under Utah's failure to identify statute). New Mexico law makes it a crime to conceal "one's true name or identity. . . with intent to obstruct the due execution of the law or with intent to intimidate, hinder or interrupt any public officer or any other person in a legal performance of his duty. . . ." NMSA §31-22-3. Under this statute, individuals must "provide police officers the minimal, essential information regarding identity so that they can perform their duties". *State v. Andrews,* 1997-NMCA-017, ¶ 6. "*Any*

delay in identifying oneself would 'hinder' or 'interrupt' law enforcement officers within the meaning of 30-22-3." *State v. Dawson,* 1999-NMCA-072, ¶ 12 (emphasis added). Thus, "Section 30-22-3 requires a person to furnish identifying information immediately upon request or, if the person has reasonable concerns about the validity of the request, so soon thereafter as not to cause any 'substantial inconvenience or expense to the police.'" *Id.* (citation omitted).

Because Corporal Bailey had reasonable suspicion to demand that Plaintiff identify himself in the first place, there is no question he had probable cause to arrest him for concealing his identity. "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe the arrestee has or is committing an offense." *York v. City of Las Cruces,* 523 F.3d 1205, 1210 (10th Cir. 2008) (internal quotation marks omitted).

In this case, Plaintiff had already been asked to identify himself by Corporal Sanchez, but refused. *UMF 16.* When Corporal Bailey arrived on scene, Corporal Sanchez advised that Plaintiff was refusing to identify himself. *UMF 19.* Corporal Bailey pointed out that was an arrestable offense, which Plaintiff immediately disputed. *UMF 20.* Corporal Bailey tried to explain to Plaintiff his basis for demanding identification, but Plaintiff continually interrupted him, arguing his belief that he did not have to identify himself and berating Corporal Bailey for contending otherwise. *UMF 20-21.* When Corporal Bailey gave Plaintiff one last opportunity to identify himself, Plaintiff made crystal clear he was not giving Corporal Bailey his ID. *UMFs 22-23.* At this point, Corporal Bailey arrested him. *UMF 24.*

Probable cause clearly supported Plaintiff's arrest for the crime charged. There is no dispute Plaintiff was the "suspicious person" that was the subject of the 911 call. *UMFs 17.* When Plaintiff refused to produce identification, Corporal Bailey had more than sufficient cause to

believe Plaintiff was concealing his identity and doing so with the intent to obstruct and hinder

Bailey's investigation, thus justifying Plaintiff's arrest.  *See Donahue,* 948 f.3d at 1194 ("When

[defendant officer] demanded [the plaintiff's name] and the [plaintiff] refused. . . [the defendant

officer] had probable cause that [the plaintiff] violated the failure-to-identify statute."). Corporal

Bailey is entitled to summary judgment on Plaintiff's claim he was arrested without probable cause

in violation of the Fourth Amendment. *Complaint, ¶ 41, 55.*

### 3.  Even if Corporal Bailey Did Lack Reasonable Suspicion to Demand Plaintiff's Identification, Bailey is Entitled to Qualified Immunity Because Existing Law Does Not Clearly Established that Reasonable Suspicion Was Lacking in the Particular Circumstances Bailey Faced

As set forth in Section IV(A)(1) above, *Mocek* suggests Corporal Bailey *did* have

reasonable suspicion to demand Plaintiff's identification.   The most factually similar case

Defendants have located in any federal court, *Smith v. Hernandez,* suggests the same.  Defendants

are not aware of any case with sufficiently similar facts that indicates that reasonable suspicion

was lacking under the circumstances of this case. *Donahue* indicates that Plaintiff's steadfast and

firm refusal to identify himself gave Corporal Bailey all the probable cause he needed to arrest

Plaintiff for concealing his identity.

The fact that there is so little case law with facts like those at issue in this case is a telltale

sign that any violation on Corporal Bailey's part would not have been clearly established. *Wesby,*

138 S. Ct. at 592 (quoting *White v. Pauly,* 137 S. Ct. 548, 552, 196 L. Ed. 2d 463 (2017) ("the fact

that a case is unusual. . . .is 'an important indication. . . that [an officer's] conduct did not violate

a "clearly established" right.'").  The Supreme Court has repeatedly "stressed the need to 'identify

a case where an officer acting under *similar circumstances.* . . .was held to have violated the Fourth

Amendment." *Wesby,* 138 S. Ct. at 590 (quoting *Pauly,* 137 S. Ct. at 552).  Because existing case

law does not provide a clear answer as to whether reasonable suspicion supported Corporal Bailey's demand for identification, Bailey is entitled to qualified immunity for any violation he may have committed in making the demand and for arresting Plaintiff for refusing to comply.

### B. Corporal Bailey is Entitled to Qualified Immunity on Plaintiff's First Amendment Claim

To survive summary judgment on his First Amendment retaliation claim Plaintiff must produce evidence from which a reasonable jury could conclude that 1) he was engaged in a constitutionally protected activity;  2) the defendant-officer's actions caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity;  and 3) the defendant-officer's actions were substantially motivated as a response to the plaintiff's exercise of his First Amendment rights. *A.M. ex rel. F.M. Holmes,* 830 F.3d 1123, 1163 (10th Cir. 2016). Furthermore, the Supreme Court has recently clarified that to prevail on a First Amendment retaliation claim, "a plaintiff must establish a 'causal connection' between the government defendant's retaliatory animus' and the plaintiff's 'subsequent injury.'. . . It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury. Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartless,* 139 S. Ct. 1715, 1722, 204 L. Ed. 2d 1 (2019) (internal citations omitted). This means that a First Amendment retaliation claim lies only when "an official takes adverse action against someone based on [retaliatory] motive, *and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences*[.]'" *Id.* (emphasis added) (internal citations omitted).

Plaintiff may argue that he satisfies the first two elements of his First Amendment Retaliation claim.  Regardless, cannot make the required showing as to the third element and he

cannot satisfy *Nieves's* causation requirement.  First, there is no evidence whatsoever of any retaliatory motive on Corporal Bailey's part.  Second, even if there were evidence of retaliatory motive, Plaintiff cannot show that retaliatory motives were a "but-for" cause of Corporal Bailey's demand for identification and arrest of Plaintiff for refusing to provide identification.  This is because, as previously set forth, Corporal Bailey possessed adequate suspicion to both demand Plaintiff's identification and then to arrest him when he failed to produce identification.

### C. Corporal Bailey and the City of Artesia are Entitled to Summary Judgment on Plaintiff's State Law Claims for False Arrest and Malicious Prosecution

As Defendants read the Complaint, Plaintiff's claims for false arrest and malicious prosecution under the New Mexico Tort Claims Act are the only claims asserted against the City of Artesia.  *Complaint, ¶ 76.* Much like his Fourth Amendment wrongful arrest claim, Plaintiff's claims for false arrest and malicious prosecution under the New Mexico Tort Claims Act "presuppose" a lack of probable cause to arrest and prosecute him for concealing his identity. *Dickson v. City of Clovis,* 2010-NMCA-058, ¶ 21, 148 N.M. 831, 837, 242 P.3d 398, 404.  As previously set forth, Corporal Bailey did ***not*** lack probable cause to arrest Plaintiff for concealing his identity. Accordingly, Plaintiff's state law claims for false arrest and malicious prosecution fail and Corporal Bailey is entitled to summary judgment on those claims as well.

### D. Defendants are Entitled to Summary Judgment on Any Claim Plaintiff is Asserting Under the New Mexico Constitution

Though he does not plead it with any specificity, Plaintiff's Complaint asserts he was deprived of "his rights, privileges or immunities secured by the constitution and laws of. . . New Mexico." *Complaint, ¶ 74.*  Plaintiff does not identify which right, privilege or immunity he was deprived of under the New Mexico Constitution or other law.  For this reason alone, any other

claim Plaintiff attempts to assert under state law should be dismissed.  Moreover, Defendants are unaware of any other claim Plaintiff could make under state law that would not, like his other state and federal claims, presuppose a lack of reasonable suspicion to demand Plaintiff's identification, or a lack of probable cause to arrest him for concealing identification. Accordingly, Defendants are entitled to summary judgment on any other state law claim Plaintiff purports to make under the New Mexico Tort Claims Act.

**WHEREFORE,** premises considered, Defendants respectfully request that the Court grant their Motion for Summary Judgment, on the basis of qualified immunity, dismiss, with prejudice, Plaintiff's Complaint and claims against them, and for such other and further relief as the Court deems just and proper.

Respectfully submitted,

**ATWOOD, MALONE, TURNER & SABIN, P.A.**

By___*/s/ **Bryan Evans***___
       Bryan Evans
       K. Renee Gantert
       PO Drawer 700
       Roswell, NM 88202-0700
       (575) 622-6221
       *Attorneys for Defendants*

I HEREBY CERTIFY that on July 1, 2021, I filed the foregoing instrument electronically through the Court's Mandatory Electronic Filing system which caused all parties of record to be served by electronic means, as more fully reflected on the emailed Notice of Electronic Filing received from the Court.

*Electronically Filed /s/ Bryan Evans*_____
Bryan Evans

FILED
5th JUDICIAL DISTRICT COURT
Eddy County
9/11/2020 5:44 PM
KAREN CHRISTESSON
CLERK OF THE COURT
Emilee Gonzalez

STATE OF NEW MEXICO
COUNTY OF EDDY
FIFTH JUDICIAL DISTRICT COURT

ALBERT BUSTILLOS,

       Plaintiff,

v.

THE CITY OF ARTESIA, and
OFFICER DAVID BAILEY,

       Defendants.

No.   D-503-CV-2020-00631

Case assigned to Riley, Lisa B.

## COMPLAINT FOR THE VIOLATIONS OF CIVIL RIGHTS

To uphold the values that our founding fathers laid out in the United States Constitution, each citizen must have the right to speak freely, obtain information from a free press, and peaceably assemble to hold the government accountable. As a country founded by the people and for the people, it is in each of our best interests to champion these rights for every citizen of a free United States of America.

COMES NOW Plaintiff Albert Bustillos, through his attorneys, Kennedy Kennedy & Ives, PC, and brings this complaint under 42 U.S.C. Section 1983 and alleges the following causes of action against the Defendants:

### JURISDICTION, VENUE, AND PARTIES

1.    Jurisdiction and venue are proper in Eddy County in the State of New Mexico.

2.    All acts complained of occurred in the City of Artesia in Eddy County in the State of New Mexico.

3.    Plaintiff Albert Bustillos (Bustillos) is a resident of the City of Carlsbad in Eddy County in the State of New Mexico.

**EXHIBIT 1**

EXHIBIT A

4.     Bustillos is an independent journalist who goes by the pen-name "Stray Dog the Exposer," and has nearly ten thousand followers on his YouTube channel.

5.     Defendant City of Artesia is a municipality in the State of New Mexico.

6.     Defendant David Bailey (Bailey) is a law enforcement officer for the City of Artesia.

7.     At all times relevant to this complaint, Bailey was acting under color of state law and within the scope of his duties as a law enforcement officer.

## FACTUAL ALLEGATIONS

8.     On or about September 11, 2018, Bustillos was at Navajo Refinery (Navajo).

9.     Navajo is located in the City of Artesia.

10.    Benito Martinez (Martinez), a security guard at Navajo spoke with Bustillos when Bustillos first arrived at Navajo.

11.    Bustillos explained to Martinez that he was only filming and taking pictures.

12.    Bustillos repeated he would not go onto Navajo property, even demonstrating his knowledge of Navajo's property line.

13.    Bustillos explained his actions and plans to Martinez, who did not try to prevent Bustillos from proceeding.

14.    At all times relevant to this Complaint, Bustillos was filming and/or taking pictures.

15.    At all times relevant to this Complaint, Bustillos was on public property and never entered onto Navajo property.

16.    Navajo's buildings and equipment stand high above the small fence at its base.

17.    Bustillos only filmed portions of Navajo that he could view unimpeded from the public road.

18.    Navajo rules and policies dictate no filming or photographing the facility.

19.     Navajo rules and policies only apply to persons while they are on Navajo property.

20.     There is no municipal, state, or federal law dictating that filming or photographing the publicly visible portions of Navajo is not allowed.

21.     In fact, the law is well established that an individual has no reasonable expectation of privacy in private property when it is open to public view.

22.     Martinez called the police and reported his encounter with Bustillos.

23.     Bailey was dispatched to Navajo based on the report from Martinez.

24.     Bailey was advised that there was a male subject walking outside the fence at Navajo and filming the facility.

25.     When Bailey arrived at Navajo, Officer Marcie Sanchez (Sanchez), who also responded to Martinez's report, was already speaking with Bustillos.

26.     At all times relevant to this complaint, Sanchez was in her full patrol uniform, driving a marked patrol vehicle, and displaying her badge of office.

27.     At all times relevant to this complaint, Bailey was in his full patrol uniform, driving a marked patrol vehicle, and displaying his badge of office.

28.     Sanchez asked Bustillos for identification.

29.     Bustillos declined to give Sanchez identification.

30.     Bailey asked Bustillos for identification.

31.     Bustillos refused to give Bailey identification.

32.     In *Brown v. Texas*, 443 U.S. 47 (1979), the Supreme Court held that officers must have reasonable suspicion of criminal activity to demand identification of a pedestrian.

33.     Bustillos was never accused or suspected of committing any crime during his interaction with either Sanchez or Bailey prior to being asked for identification.

34.     At all times relevant to this Complaint, Bailey did not have reasonable suspicion that Bustillos participated in any criminal activity.

35.     Nor did Bustillos pose any danger to Bailey, Sanchez, or anyone else.

36.     Bailey has admitted that Bustillos was not on Navajo property during their encounter.

37.     Bustillos, who could not have been reasonably suspected of committing any crime, could not have been lawfully detained by the officers and had an absolute right to refuse to identify himself.

38.     Bailey arrested Bustillos on a charge of concealing identity.

39.     Bailey placed Bustillos in double-locked handcuffs and brought him to the patrol unit.

40.     Bailey gathered information about why the police were dispatched to Navajo only after Bustillos was arrested.

41.     Bailey did not have probable cause to arrest Bustillos for concealing identity or any other crime.

42.     As a result of Bailey's actions, Bustillos was arrested, charged with a crime, and forced to hire attorneys and defend himself until his charges were dismissed.

43.     All preceding paragraphs are incorporated by reference to the counts below.

## COUNT 1:
## Violation of Fourth Amendment Rights

44.     Plaintiff hereby incorporates above as if restated fully herein.

45.     A warrantless arrest violates the Fourth Amendment unless probable cause exists to believe a crime has been or is being committed.

46.     The Fourth Amendment does not permit an officer to arrest someone for concealing identity without reasonable suspicion of some predicate, underlying crime.

47.     For reasonable suspicion, an officer must have a particularized, objective basis for suspecting that criminal activity is afoot.

48.     Bailey arrested Bustillos for concealing identity without a warrant.

49.     There was no particularized, objective basis for suspecting that Bustillos was involved in any predicate, underlying crime.

50.     Bustillos never set foot on Navajo property and Bailey had no information to the contrary.

51.     Bustillos did not commit a crime by filming the Navajo facility while remaining on public property.

52.     It is not a crime to question law enforcement officers or to refuse to produce identification in response to an unlawful order to do so.

53.     Bustillos did not engage in any physical act of resistance prior to his arrest.

54.     Bailey, therefore, lacked reasonable suspicion to detain Bustillos and to demand his identification.

55.     Bailey lacked probable cause to arrest Bustillos for concealing identity or any other crime.

56.     Following the arrest, Bailey continued Bustillos's prosecution until the original action terminated in favor of Bustillos.

57.     There was not probable cause, or even arguable probable cause, to support the original arrest or continued prosecution.

58.     Bailey acted with malice by prosecuting Bustillos for concealing identity without arguable probable cause that Bustillos committed that, or any other, criminal offense.

59.     Bustillos suffered damages as a result of the false arrest and malicious prosecution.

## COUNT 2:
## Violation of First Amendment Rights

60.     Plaintiff hereby incorporates above as if restated fully herein.

5

61.    The First Amendment of the United States Constitution protects the rights of all persons to freely express themselves.

62.    This includes the right to speak and not to speak, the freedom of the press, and the right to peaceably assemble.

63.    As part of the First Amendment, it is well established that the government may not limit the stock of information from which members of the public may draw.

64.    The First Amendment protects the right of the people to receive information and ideas, which includes the right to photograph and record from public spaces and to photograph and record police activity.

65.    Bustillos freely expressed himself by filming the Navajo facility, which is visible from the public forum and to the public eye.

66.    Bustillos lawfully filmed Navajo and lawfully filmed the police.

67.    Bustillos peaceably assembled on public property and operated his video recorder with the purpose of gathering information as a journalist to publish for his subscribers.

68.    Bustillos exercised his right of free speech by questioning the officers about the basis for his unlawful detention and arrest, and by refusing to identify himself.

69.    Bailey retaliated against Bustillos for exercising his First Amendment rights.

70.    Bailey had no basis to demand Bustillos' identity under pain of arrest.

71.    Bailey had no basis to detain or arrest Bustillos for the act of filming from public property.

72.    Bustillos's First Amendment rights were violated when Bailey arrested him and prosecuted him for concealing his identity.

73.    As a result, Bustillos suffered damages.

## COUNT 3:
## Violation of the New Mexico Tort Claims Act

74.     For the same reasons stated above, Bailey committed the torts of false arrest and malicious prosecution and deprived Bustillos of his rights, privileges or immunities secured by the constitution and laws of the United States and New Mexico.

75.     Bailey's conduct resulted in personal injury and damages to Bustillos.

76.     The City of Artesia is vicariously liable for Bailey's conduct, which occurred in the scope of duty.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully seeks the following relief:

I.      Award damages in an amount sufficient to compensate Bustillos for Defendants' conduct;

II.     Interest and costs for bringing this action, including attorneys' fees; and

III.    Any other relief the Court deems just and proper.

Respectfully submitted,

KENNEDY KENNEDY & IVES, PC

*/s/ Joseph P. Kennedy*
Joseph P. Kennedy
Adam C. Flores
*Attorney for Plaintiff*
1000 2nd St. NW
Albuquerque, NM  87102
(505) 244.1400 / fax (505) 244.1406
jpk@civilrightslaw.com
acf@civilrightslaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ALBERT BUSTILLOS,

                    Plaintiff,

-vs-                    NO:  2:20-CV-010600JCH-GJF

THE CITY OF ARTESIA and OFFICER DAVID BAILEY

                    Defendants.


DEPOSITION OF ALBERT BUSTILLOS

APRIL 27, 2021
1:30 P.M.
400 NORTH PENNSYLVANIA
ROSWELL, NEW MEXICO


     PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY:  BRYAN EVANS, ESQ.
           ATTORNEY FOR DEFENDANTS

REPORTED BY:  Lorena H. Romero
              CCR #184
              Romero Reporting, Inc.
              P.O. Box 50
              Picacho, New Mexico  88343

---

2

                    APPEARANCES

For the Plaintiff:

     KENNEDY, KENNEDY & IVES, P.C.
     1000 2ND ST., NW
     ALBUQUERQUE, NM  87102

     BY:  JOSEPH P. KENNEDY, ESQ.

For the Defendants:

     ATWOOD, MALONE, TURNER & SABIN, P.A.
     P.O. Drawer 700
     Roswell, NM  88202-0700
     505-622-6221
     BY:  BRYAN EVANS, ESQ.

---

3

1          ALBERT BUSTILLOS,
2  having been first duly sworn, testified as follows:
3                    EXAMINATION
4  BY MR. EVANS:
5      Q.   You're Albert Bustillos, correct?
6      A.   Yes, sir.
7      Q.   Mr. Bustillos, have you ever given a
8  deposition before?
9      A.   Yes.
10     Q.   How many times?
11     A.   Once that I remember.
12     Q.   How long ago was that?
13     A.   About 15, 16 years ago, somewhere around
14 there.
15     Q.   What were the circumstances of you giving
16 a deposition?
17     A.   It was oilfield.  I drove trucks for eight
18 years in the oilfield and there was companies
19 reporting of illegal dumping.  So they were trying
20 to get to the bottom and they had some of us go and
21 do depositions and give a we know or who we thought
22 might or which company might be doing it or things
23 like that.  Pretty much it was just to clear our own
24 company that I was working for.
25     Q.   So you were a witness in that case as

---

4

1  opposed to being a party in the case?
2      A.   I guess that's how you'd say it, yes, sir.
3      Q.   All right.  Well, from that deposition and
4  then the times that you've testified in Court, I'm
5  sure you have some idea of how this works.  I
6  represent the police officer that you sued and the
7  City of Artesia and I'm here to ask you some
8  questions about what happened in that incident, what
9  your damages may be, things of that sort.
10          Couple of ground rules that we should try
11 and keep in mind as we go along here this afternoon:
12 If you need to take a break for any reason, use the
13 bathroom, go outside, stretch your legs, have a
14 smoke, talk to your lawyer, whatever, that's fine.
15     A.   Okay.
16     Q.   Only thing I would ask is that if there's
17 a question on the table that we get that question
18 answered before we take our break.
19     A.   All right.
20     Q.   If you're asked a question today that you
21 don't understand for any reason at all, I need you
22 to let me know that, okay?  If you go ahead and
23 answer the question the way it was asked, we're
24 going to assume that you understood it the way it
25 was asked, okay?

EXHIBIT
2

1  guard, I told the security guard when they first
2  approached me at the very beginning, I told him what
3  I was doing and I would like if somebody could come
4  out and actually give me an interview, maybe give me
5  a tour, it would make a better video.  I told him
6  that, yes.
7      Q.   Okay.  At any other occasion or whenever
8  you dealt with anybody else from Navajo, did you
9  ever ask them for information or a tour or anything
10 like that?
11     A.   No.
12     Q.   Okay.  This trip that you made out to the
13 WIPP Site, did you do that before your filming at
14 Navajo or after?
15     A.   Before.
16     Q.   Before?  When was it before, more or less?
17     A.   I'd say two weeks to a month and a half, I
18 can't really be specific.  I could look it up for
19 you, if you want.
20     Q.   No, that's okay.  I --
21     A.   I can show you the video.
22     Q.   But you know it was before you went to
23 Navajo?
24     A.   Yeah, it was absolutely before.  It was
25 one of my motivations.

1  right?
2      A.   Not the main WIPP site.  The building in
3  Carlsbad, the office, like a big three-story, huge
4  building.
5      Q.   But not out at the WIPP site itself?
6      A.   No, I haven't gone there yet.
7      Q.   Other than the Navajo and WIPP site office
8  in Carlsbad, had you ever gone and filmed any other
9  places that were involved in, like, the energy
10 industry?
11     A.   No.
12     Q.   Okay.
13     A.   I hadn't -- WIPP was the first one that
14 I've done, that I tried to make in a professional
15 manner and it look good and I wanted to keep that up
16 and start building video, catalog with these, you
17 know, and --
18     Q.   After this incident, have you gone and
19 filmed any other places that are involved in the
20 energy industry?
21     A.   No.
22     Q.   Why not?
23     A.   Like I said, they kind of ruined the
24 thrill of it for me.
25     Q.   What did?

1      Q.   Huh?
2      A.   It was one of my motivations to keep doing
3  work.  I wanted to keep doing more facilities.  I
4  wanted to keep filming, I didn't want to stop.  I
5  wanted to do like maybe Intrepid Potash, you know,
6  because that's a big industry in our area that a lot
7  of people work, you know.
8           The oilfield became a big thing in our
9  economy.  The economy boomed.  So many people moved
10 here.  It was a big deal so it was matters of public
11 interest that I would go and create a news article
12 with it, you know.  So that was my intentions.  It
13 was to go do -- just like the WIPP.  As a huge part
14 of Carlsbad, it's world-wide news.  And people know
15 of oilfields and all this stuff but most don't
16 realize how it turns into fuel, into gas or asphalt
17 and all this stuff.  So I wanted to go show them the
18 work, how -- you know, and firsthand knowledge type
19 stuff.
20     Q.   Did you ever go film any of the potash
21 mines?
22     A.   No, I never did.  I kind of lost interest
23 or motivation after this.
24     Q.   Okay.  Before this incident happened, you
25 had gone out to the WIPP site and filmed out there,

1      A.   Being arrested.
2      Q.   Okay.  Before you headed out there that
3  day, did you meet up with anybody or talk with
4  anybody about what you were going to do?
5      A.   I told my mom, you know, that's where I'm
6  headed.
7      Q.   What did you tell her?
8      A.   I'm going to go cover a story, go record a
9  thing for my next video.  She said okay, be careful,
10 you know.
11     Q.   Did you tell her you were going to Navajo?
12     A.   Yeah, she knew that's exactly where I was
13 going.  She didn't know until that morning but I
14 told her.
15     Q.   Did you tell anybody else before you went
16 out there?
17     A.   No.
18     Q.   Did you meet up with anybody that morning
19 before you went out to Navajo?
20     A.   No.
21     Q.   And you got there by driving from Carlsbad
22 to Artesia, right?
23     A.   Yes.
24     Q.   Okay.  In your own car?
25     A.   Yes.

81

```
 1     Q.    What kind of car did you have that day?
 2     A.    I had a 1990 G 20 van, Chevy van.  A Chevy
 3  G 20.
 4     Q.    No problem.  Where did you park?
 5     A.    One of the restaurants.
 6     Q.    In Artesia?
 7     A.    Yeah.
 8     Q.    Which one?
 9     A.    I don't even know the name of it.
10     Q.    Where was it located in relation to the
11  Navajo plant?
12     A.    It's on Main Street or one of those things
13  there.  I'm not sure, there's so many -- I'm not
14  familiar -- I know how to drive through Artesia.  I
15  just don't know, you know what I mean?
16     Q.    How far away from the plant did you park?
17     A.    Maybe half a mile.
18     Q.    Okay.
19     A.    Maybe not even that.  It was like a block
20  and then there was the highway.  So I crossed the
21  highway and then I'm right there, you know.
22     Q.    Okay.  So you parked on the other side of
23  the Roswell Carlsbad Highway and then walked over to
24  Navajo?
25     A.    Yeah.  Yeah.
```

82

```
 1     Q.    Okay.  Any reason why you didn't park
 2  closer to the Navajo plant?
 3     A.    There's no parking.
 4     Q.    Okay.
 5     A.    I didn't know where to park but I knew
 6  over here it would be safe, you know.
 7     Q.    You got arrested and taken down to
 8  Carlsbad and spent two days down there.  What
 9  happened to your car?
10     A.    My mom picked it up.
11     Q.    When did she pick it up?
12     A.    Same night.
13     Q.    That you got arrested?
14     A.    I have spare keys so her husband brought
15  her to pick it up and she drove it home for me.
16     Q.    Did they have the keys or were they stuck
17  under the top -- of the wheel well or what?
18     A.    No, at my house.
19     Q.    So they came up to Artesia, got your car
20  and drove it home that same night of the day you got
21  arrested?
22     A.    Yes.
23     Q.    Did anybody go with you to the Navajo
24  plant?
25     A.    No.
```

83

```
 1     Q.    Was anybody with you at all anywhere
 2  during the time you were at Navajo?
 3     A.    No.
 4     Q.    Did anybody besides your mom know that you
 5  were going to go to the Navajo plant and work on
 6  your story?
 7     A.    No.
 8     Q.    All right.  You've kind of touched on this
 9  but I want to be sure to give you a chance to tell
10  me the full answer.  Why was it that you chose to
11  film the refinery?
12     A.    It's matters of public interest.
13     Q.    How is the refinery a matter of public
14  interest?
15     A.    Oilfield boom, huge oilfield industry in
16  our area that has overcame this territory in the
17  last few years, and -- so it's what's going on
18  around here.  So matters of public interest and
19  people want to know, so I'm making a video.  I was
20  intending to make a video, just informative video.
21     Q.    So what do you think the people would
22  learn from your video of just the smoke stacks and
23  the derricks and the pipes that are there at the
24  plant?  How do you think that would feed the
25  public's need to know?
```

84

```
 1     A.    As I was explaining to them because I went
 2  into --
 3           (Interruption by Reporter.)
 4     Q.    I was asking you how the public was going
 5  to be informed by shooting video of the fence and
 6  the piping of the plant and just that stuff that you
 7  can see from the street.
 8     A.    I'm explaining to them what goes on.  As
 9  I'm showing them, these, you know, do this.  I
10  forget which tank that they put the crude in, but I
11  know it gets heated up and different things
12  evaporate at different temperatures.  So like -- and
13  this is exact because I visit the specifics I
14  couldn't remember.
15           So just as an example, this isn't -- but
16  let's say gasoline will evaporate at 200 degrees.
17  And diesel will evaporate at 180 degrees and
18  something else a little below that, that's their
19  evaporating temperature.  So it rises same way you
20  would make distilled water or moonshine.  It rises
21  and turns back into liquid and that's how they
22  separate the liquids into what they become and they
23  get refined into the fuels that they are.  Then
24  there's the leftovers that they make oil, they make
25  plastic, that they make -- an absolute plastic
```

```
 1   I would have because then I would be legally
 2   obligated to.  But before that, I don't got to and I
 3   won't surrender my rights for anyone.  Plain and
 4   simple.  Too many people have died for those rights.
 5   I would be a huge dishonor for me to just give them
 6   up like that just because a cop shows up.  Cop has
 7   no authority unless I've broken the law.
 8        Q.    So when they were talking to you and
 9   asking for your ID, you were not intending to and
10   you were not going to give them your ID?
11        A.    No.
12        Q.    Other than you sticking up for your
13   rights, was there any other reason why you did not
14   give them your ID?
15        A.    No.
16        Q.    Describe for me the camera setup that you
17   had that day.
18        A.    It was just a cell phone.  I had -- it's
19   called a C grip stabilizer, and my cell phone was on
20   top.  My Nikon disk camera was on the bottom side.
21   My Nikon was what I was going to use to static
22   record.  And my -- I like -- because I didn't have
23   expensive cameras and stuff then, my camera would
24   record audio and my phone will record audio but one
25   worked better indoors and one worked better
```

```
 1   outdoors.  So sometimes I would take a video from
 2   one camera and use the audio of the other one.
 3   Because one would record -- like if I'm outside it's
 4   going to pick up traffic and everything, it's just
 5   over loud and too much noise.  And the other one,
 6   it's more clean, normal, like you would here.  And
 7   going indoor, kind of vice-a-versa.  So I had them
 8   both set up that way but since, like I said, they
 9   went -- and I had this -- same battery back right
10   here is the one I had taped or Velcroed to the
11   bottom and that's what my cell phone was plugged
12   into, just like this.
13        Q.    Okay.  So that day you had your cell
14   phone, right?
15        A.    Yes.
16        Q.    A stabilizer device of some kind?
17        A.    Yes.
18        Q.    Your Nikon camera, right?
19        A.    Yes.
20        Q.    And then a battery pack?
21        A.    Yes.
22        Q.    Did you have any other components to your
23   rig that day besides those?
24        A.    That's all it took.  That was it.
25        Q.    What cell phone did you have?
```

```
 1        A.    It was a LG V 20.
 2        Q.    Do you still have it?
 3        A.    No.
 4        Q.    What happened to it?
 5        A.    Just ran its course.
 6        Q.    What does that mean?
 7        A.    It means it's dead, no good.  My new one.
 8        Q.    Where is the old LG V 20?
 9        A.    God knows, somewhere in a landfill.
10        Q.    When did you get rid of it?
11        A.    When it busted on me.  It just quit
12   working.  I had it for, like, three or whatever
13   years.  It just wore out entirely.  It would hang up
14   on its own in the middle of calls and stuff.  So I
15   finally got that one and tossed it.
16        Q.    So more or less, when did you get rid of
17   the LG V 20?
18        A.    I don't know, man, a year ago?  Two years
19   ago?  I don't know.
20        Q.    And you had a stabilizer device?
21        A.    Yes.
22        Q.    How does that work?  What is that?
23        A.    It's just a C grip stabilizer.  You put
24   that on and it just helps you hold your equipment
25   more stabilized manner instead of shaking or all
```

```
 1   that, just more stable.
 2        Q.    And do you still have that the device?
 3        A.    Yes.
 4        Q.    And you had a Nikon camera also?
 5        A.    Yes.
 6        Q.    Was it for video or the still photos or
 7   both?
 8        A.    It does both.
 9        Q.    What type or brand or model was it?
10        A.    It was only -- it's a P 100, the one I had
11   then, that I used then.
12        Q.    You still have that?
13        A.    Yeah.  Yes.
14        Q.    Okay.  And then the battery pack, the same
15   one you have today?
16        A.    This one here.
17        Q.    All right.  Did you have any other
18   equipment on that rig?
19        A.    No.
20        Q.    Okay.  The video that we've all seen, the
21   one that was, I guess, uploaded that you live
22   streamed, what device was that recorded with?
23        A.    The LG V 20.  It was recorded, it was live
24   streamed.
25        Q.    The cell phone?
```

125

```
 1      Q.    And that was live stream?
 2      A.    That was a live stream, and I think -- I
 3   have very few life streams, very few live streams.
 4      Q.    Okay.  In the description that I've seen,
 5   the written description that goes with the video of
 6   this incident, there's a written description there
 7   and it looks like it's worded as if it's written by
 8   you and it says something in there about who the
 9   officer involved was and the phone number for the
10   Artesia Police Department.  You know what I'm
11   talking about?
12      A.    Yes.
13      Q.    Did you put that description in there?
14      A.    Yes.
15      Q.    Why do you put the officer's name and
16   phone number for the department in that description?
17      A.    So people can know who the officer was.
18      Q.    Okay.  And --
19      A.    So they can --
20      Q.    -- giving them the name tells who the
21   officer was.  Why do you put the phone number in
22   there?
23      A.    Because people have a First Amendment
24   right to address their grievances to the Government.
25      Q.    So you put the phone number in there with
```

126

```
 1   the expectation that people will call the police
 2   department, correct?
 3      A.    No.  I put it there, if people want the
 4   information it's there.  Kind of save them the time
 5   having to look it up.
 6      Q.    Why would they want to look it up?
 7      A.    Because people like to address their
 8   grievances.
 9      Q.    By doing what, calling the Police
10   Department?
11      A.    Whoever they call.  Some people get mad
12   and call the Mayor, you know.  I've never done that
13   but some people do.
14      Q.    So some people will watch your video and
15   they'll have whatever reaction they have to it and
16   they'll have the phone number there that you
17   provided so that they can call the Police Department
18   and express their opinion about what happened,
19   right?
20      A.    What happens, someone will call and try
21   and talk to a supervisor or the Chief or someone
22   like that to get answers.  And I know --
23      Q.    People who watched your video?
24      A.    Who -- I don't mean me specifically, I'm
25   saying in general, this is what goes on.
```

127

```
 1      Q.    Right.
 2      A.    People call and want to speak and get
 3   explanations and they'll have cordial conversations
 4   and all that.  But -- I think I ran out of space.
 5   Anyways, but then there are those rogue people.
 6   We're not responsible for anyone, you know what I
 7   mean?  People act on their own.  We don't say guys,
 8   call them now and give them hell, you know.  I've
 9   never told my audience that so, you know, but the
10   information is there.
11      Q.    Are there some cop watchers that do that?
12   They say hey, here's the number, here's the officer
13   involved, call this department and let them know
14   what you think?
15      A.    Just like there's dirty cops, there's
16   dirty cop watchers.
17      Q.    And that's the kind of stuff they do, they
18   encourage the viewers to do that?  Is that what they
19   do?
20      A.    There are a couple that do, but not me,
21   not ever.
22      Q.    Do you know what was the result of the
23   phone number and the officer's name being attached
24   to your video in this case?
25      A.    I know there was several people who
```

128

```
 1   addressed their grievances, not by my orders though.
 2      Q.    Okay.  Do you know how many did that?
 3      A.    No, I don't.
 4      Q.    Any idea from any source that you've ever
 5   heard?
 6      A.    No.  I know there was some because they
 7   began calling while I was in jail.
 8      Q.    Who called, the viewers that had seen your
 9   video?
10      A.    The people -- the people at the jail, the
11   jail guards, you know, they thought I might have
12   been someone famous or something.  They're like "who
13   did we arrest?"  I'm just a dude but everybody saw
14   the live stream and those who saw it got angry and
15   they shared it on their channels.  So their viewers
16   got angry and they started making phone calls and
17   they shared it on their channels.  And it went on
18   and went on.  So they took my videos and spread it
19   so.
20      Q.    The film that I've seen off of your
21   YouTube channel, it starts whenever you are first
22   encountering Benito, the Navajo security person.
23      A.    Yes.
24      Q.    That's the one that I've seen off of your
25   YouTube channel.
```

129

```
 1       A.    Yes.
 2       Q.    Did you -- did your video start any time
 3  before that?
 4       A.    No.  That's exactly when it started.  See,
 5  when you go on, you've got to go through things and
 6  YouTube and then you've got to type in stuff.  So it
 7  takes -- you know, you go as fast as you can, but
 8  you've got to set it up before you go live.  So
 9  that's when it finally hit go live now, that's where
10  it began, right there.
11       Q.    Okay.  So there's not any video that came
12  before that you edited off or anything?
13       A.    No.  No, that's where it starts.
14       Q.    Is there any footage at all from any of
15  that trip of yours to the Navajo Refinery, any
16  footage at all that you edited out at all?
17       A.    No.  No.
18       Q.    So what we can see on your channel is all
19  of the live streaming video that there is of that
20  encounter?
21       A.    That is a hundred percent everything right
22  there.
23       Q.    Okay.  A few weeks ago we had somebody
24  call up here to our office overnight and leave a
25  message for me specifically.  And it was extremely
```

                    Romero Reporting
                    575-653-4645

130

```
 1  vulgar and accused me of being a cop lover and he
 2  was going to fuck me up and do this and do that,
 3  here at the office.  Of course they didn't leave
 4  their name or anything like that, but a real vulgar,
 5  nasty offensive message left for me here at my
 6  office.
 7       Do you have any idea how somebody would
 8  have gotten my name?
 9       A.    I have no idea, I didn't even know your
10  name.  I have no idea.
11       Q.    Do you know of any cop watchers who ever
12  follow these cases and figure out who the lawyers
13  involved are and call the lawyer offices?
14       A.    Never have.
15       Q.    Ever heard of that before?
16       A.    Never have.  Were they talking about me?
17       Q.    They were talking about me.
18       A.    Did they say from Stray Dog?
19       Q.    I didn't mention --
20       A.    Had to be a separate case you were working
21  on, had nothing to do with me.
22       Q.    Okay.  You don't know anything about that?
23       A.    Not at all.  That's not my style.
24       Q.    Let's take another break.
25             (Short break, 4:20 to 4:40.)
```

                    Romero Reporting
                    575-653-4645

131

```
 1       Q.    All right.  Mr. Bustillos, we're back on
 2  the record.  At the time that you went to Navajo
 3  that afternoon and did your filming, what was your
 4  belief as to where the boundary was for Navajo's
 5  property versus public property?  What did you
 6  believe the boundary was?
 7       A.    Where the utility markers are.
 8       Q.    When you say "utility markers", what do
 9  you mean?
10       A.    Anything like electrical poles, water
11  lines, telephone lines, all that stuff that's
12  usually buried and stuff like that alongside a road
13  or highway, that's where the city -- they usually
14  put that on the line, the -- the property line
15  because they ain't going to put that on somebody
16  else's property, they're going to put it on public
17  property.  So usually that's how you can tell but
18  me, I went off the GIS maps and it confirmed that's
19  exactly where it was.
20       Q.    When you looked at the GIS maps, did it
21  show you that the boundary on the GIS maps was the
22  same as the line of the utility poles?
23       A.    Yes.
24       Q.    Okay.  And I'm not quite sure what you
25  mean when you say the GIS.  What is that?
```

                    Romero Reporting
                    575-653-4645

132

```
 1       A.    Government Informational Survey or
 2  something like that.  Don't quote me but it's
 3  something to that effect, government survey.
 4       Q.    But you know for sure the initials are
 5  GIS?
 6       A.    Yes.
 7       Q.    And that's something on the Internet that
 8  you can find?
 9       A.    Yes.  I just look up Eddy County, GIS
10  maps, Eddy County or whatever, anywhere you want.
11       Q.    That's how you found it in this case?
12       A.    Yes.  It's also on one of my update
13  videos.  I think it was the very next follow-up
14  video, update video actually, I show the maps on my
15  video and show exactly where I was and I do a
16  whole --
17       Q.    For this incident?
18       A.    For this incident.
19       Q.    Okay.  Did you ever print out and save
20  anything related to your GIS survey research for
21  this location?
22       A.    No.  It's just on the video, you know.
23  You record your screen and make your videos so you
24  kind of click and show so viewers can see the mouse
25  cursor, you know, and you point and do all this and
```

                    Romero Reporting
                    575-653-4645



CFS Number: APD-2018-09-00020283



**ARTESIA POLICE DEPARTMENT**

| | |
|---|---|
| Caller Name | Latitude |
| Caller Phone | Longitude |
| Caller Address | Service |
| Caller City | Confidence Factor |
| Caller Building | ESN |
| Caller Apt. Unit | Uncertainty Factor |
| Carrier | Cell Site |

Created Date/Time: 9/11/2018 12:56:25 PM

## Additional Information

### Report Number Information

| Report Number | Foreign Report | Agency |
|---|---|---|
| APD180002215 | N - No | APD |

### Disposition Information

| Disposition | UnitID | Primary Unit Indicator | Disposition Comments |
|---|---|---|---|
| REPORT | | N - No | |

### Comments

| Comment DateTime | Comment Text | UserId | DeviceId |
|---|---|---|---|
| 9/11/2018 12:54:27 PM | RP ADV THAT THERE IS A MALE SUBJECT THAT IS FILMING NAVAJO <br><br> RP IS GOING TO BE STANDING BY <br><br> SUBJECT IS ON THE OUTSIDE OF THE FENCE BUT FILMING THE INSIDE OF THE REFINERY YARD | CROBINSON | STATION1 |
| 9/11/2018 12:54:59 PM | MALE SUBJECT IS ON FOOT | CROBINSON | STATION1 |
| 9/11/2018 12:55:16 PM | FILMING EMPLOYEE VEHICLES | CROBINSON | STATION1 |
| 9/11/2018 12:55:48 PM | SUBJECT IS WEARING BROWN SHIRT AND BLUE LEVI SHORTS AND A FISHERMAN'S HAT | CROBINSON | STATION1 |
| 9/11/2018 12:57:17 PM | RP ADV THAT THERE IS AN EMPOLYEE THAT IS FILMING HIM NOW | CROBINSON | STATION1 |
| 9/11/2018 12:57:52 PM | RP ADV THAT THEY ARE AT THE MAIN OFFICE AND THE SUBJECT IS WALKING EB | CROBINSON | STATION1 |

**EXHIBIT**
**4**

CFS Number: APD-2018-09-00020283



ARTESIA POLICE DEPARTMENT

| 9/11/2018 1:08:42 PM | 10-15 (APD/722) | | CROBINSON | STATION1 |
|---|---|---|---|---|
| 9/11/2018 1:17:40 PM | ER 10-81 WITH 10-15 (APD/722) | | CROBINSON | STATION1 |

Unit Assignments

| Unitid | APD/722 | Dispatch DateTime | 9/11/2018 12:57:57 PM |
|---|---|---|---|
| Agency | APD | Enroute DateTime | 9/11/2018 12:58:08 PM |
| Primary Unit Flag | Y - Yes | Arrive DateTime | 9/11/2018 1:01:34 PM |
| Temporary Unit Flag | N - No | Clear DateTime | 9/11/2018 1:36:09 PM |

**Officers**
722 - BAILEY, DAVID

| Unitid | APD/725 | Dispatch DateTime | 9/11/2018 12:59:01 PM |
|---|---|---|---|
| Agency | APD | Enroute DateTime | 9/11/2018 12:59:09 PM |
| Primary Unit Flag | N - No | Arrive DateTime | 9/11/2018 12:59:09 PM |
| Temporary Unit Flag | N - No | Clear DateTime | 9/11/2018 1:24:56 PM |

**Officers**
725 - SANCHEZ, MARCIE

Notes





Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


ALBERT BUSTILLOS,

                        Plaintiff,

 -vs-                    NO:  20-CV-01060-JCH/GJF

THE CITY OF ARTESIA and OFFICER DAVID BAILEY,

                        Defendants.




REMOTE ZOOM DEPOSITION OF MARCIE SANCHEZ

April 29, 2021
3:30 p.m.



PURSUANT TO THE FEDERAL RULES OF CIVIL

PROCEDURE, this deposition was:

TAKEN BY:  JOSEPH P. KENNEDY
           ATTORNEY FOR PLAINTIFF

REPORTED BY:  Jan Gibson, CCR, RPR, CRR
              Paul Baca Court Reporters
              500 Fourth Street, NW - Suite 105
              Albuquerque, New Mexico  87102

**EXHIBIT 7**

Page 2

1              APPEARANCES
2  For the Plaintiff:
3    JOSEPH P. KENNEDY
       KENNEDY KENNEDY & IVES, PC
4    1000 2nd Street, NW
       Albuquerque, New Mexico 87102
5    jpk@civilrightslaw.com
6  For the Defendants:
7    BRYAN EVANS
       ATWOOD, MALONE, TURNER & SABIN, P.A.
8    P.O. Drawer 700
       Roswell, New Mexico 88202-9700
9      bevans@atwoodmalone.com
10
11              INDEX
12  THE WITNESS:              PAGE:
13  MARCIE SANCHEZ
14    Examination by Mr. Kennedy...3
15  Reporter's Certificate...16
16
17
18
19
20
21
22
23
24
25

Page 3

1   (Note:  In session at 3:30.)
2         THE COURT REPORTER:  Good afternoon.
3   Today is April 29, 20201.  The time is 3:30.  This
4   is the deposition of Marcie Sanchez.  Would counsel
5   please state their appearances beginning with the
6   plaintiff.
7         MR. KENNEDY:  This is Joe Kennedy on
8   behalf of the plaintiff.
9         MR. EVANS:  Bryan Evans for defendants.
10            MARCIE SANCHEZ
11   after having been first duly sworn under oath,
12   was questioned and testified as follows:
13            EXAMINATION
14   BY MR. KENNEDY
15   Q.   Could you state your name, please?
16   A.   Marcie Sanchez.
17   Q.   And you're employed with the City of
18   Artesia; is that correct?
19   A.   Yes, sir.
20   Q.   And in what capacity are you employed?
21   A.   Right now I'm a patrol sergeant.
22   Q.   And how long have you worked for the City
23   of Artesia?
24   A.   For about four years.
25   Q.   And did you work in law enforcement before

Page 4

1   the City of Artesia?
2   A.   Yes, sir.
3   Q.   Where did you work?
4   A.   I worked for the Alamogordo Police
5   Department for seven years.
6   Q.   And why did you go to Artesia?
7   A.   I follow my husband around with his
8   division.  He's a high school coach and a coaching
9   position opened up in Roswell.
10   Q.   Okay.  Now, you understand we're here
11   about the arrest of Albert Bustillos on September
12   11, 2018, right?
13   A.   Yes, sir.
14   Q.   All right.  Have you had a chance to
15   review anything about that arrest before coming
16   today?
17   A.   I read my police report, the transcripts
18   of the court proceedings before of it.
19   Q.   Okay.  What do you recall as far as what
20   was the initiation of the call for service at Navajo
21   Refinery?
22   A.   Corporal Bailey and I worked together at
23   that point and we were both corporals.  He was
24   dispatched to Navajo in reference to a male
25   recording Navajo property.

Page 5

1   Q.   And how do you know that he was dispatched
2   to Navajo?
3   A.   It came over dispatch.  It came over the
4   air.  Corporal Bailey was dispatched but just
5   working together, being partners, I decided to
6   respond to the call also.
7   Q.   So you drive -- at the time you drove two
8   separate units, correct?
9   A.   Yes, sir.
10   Q.   And what do you recall about the
11   dispatcher saying about the nature of the call, if
12   anything?
13   A.   I believe it was a security guard who
14   called it in and the male subject was recording
15   Navajo property.
16   Q.   All right.  Do you recall receiving any
17   other or hearing any other information from the
18   dispatcher radio?
19   A.   Not that I recall.
20   Q.   All right.  And is the dispatcher, is it
21   basically a transmission that's available to all
22   City of Artesia law enforcement officers?
23   A.   Yes, and whoever else scans it.
24   Q.   Right.  So what did you do when you
25   arrived at the Navajo Refinery?

2  (Pages 2 to 5)

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM 87102

Page 6

1    A.   When I arrived the male that they had
2  described was speaking with, it looked like, a
3  Navajo employee so I walked over to the male.
4    Q.   All right.  Do you recall where they were
5  standing, the two men?
6    A.   Near a Navajo Refinery parking lot.
7    Q.   Did you get a sense of what their
8  conversation was like as far as the demeanor of the
9  two men?
10    A.   No, sir.
11    Q.   And what did you do when you arrived to
12  where the two men were?
13    A.   I asked Mr. Bustillos if there was
14  anything I could help him with.
15    Q.   And do you recall what he said?
16    A.   I believe he asked me to identify myself.
17    Q.   And what did you do in response to that?
18    A.   I gave him my name and my call number at
19  the time.
20    Q.   And then what happened then?
21    A.   I asked him what he was doing and asked
22  him for his ID.
23    Q.   And did he respond to what he was doing?
24    A.   I don't know if he responded the first
25  time but I do believe he said he wasn't going to

Page 7

1  provide me his ID.
2    Q.   All right.  At some point he does tell you
3  what he's doing there, right?
4    A.   Yes, sir.
5    Q.   And before he's arrested; is that correct?
6    A.   Yes, sir.
7    Q.   All right.  What do you recall about him
8  telling you what he was doing there?
9    A.   He said he was recording, and I believe it
10  was something to the effect of public matters or
11  matters of interest to the public, something like
12  that.
13    Q.   Okay.  Did you ask him questions about --
14  did he say he was a journalist?
15    A.   I don't recall if he was a
16  journalist or not.  Maybe he did.
17    Q.   And when you first approached did you have
18  any understanding of whether the two men were on
19  public property or on private Navajo Refinery
20  property?
21    A.   No, sir, I didn't know whether it was
22  public or private property at that point.
23    Q.   All right.  Did the Navajo Refinery
24  employees say anything to you about Bustillos at
25  that point in time when you first approached and

Page 8

1  talked to Bustillos?
2    A.   Not that I recall.
3    Q.   At that point in time when you asked
4  Bustillos for identification, did you have any
5  reasonable suspicion that he was engaged in criminal
6  activity?
7    A.   I don't know where he was before I got
8  there, so I don't know if he had trespassed onto
9  their property or if we were on their property at
10  that point.
11    Q.   Right, but you didn't have any information
12  about where he was before you got there; is that
13  correct?
14    A.   No, sir, I didn't know exactly where he
15  was before.
16    Q.   And you didn't get any information from
17  dispatch telling you exactly where he was before you
18  got there, correct?
19    A.   Not that I recall.
20    Q.   All right.  And the Navajo Refinery
21  employee never said to you immediately or -- well,
22  at that time, before you asked for identification
23  that -- he never accused Mr. Bustillos of
24  trespassing on refinery property, did he?
25    MR. EVANS:  Object to the form.  Go ahead.

Page 9

1    Q.   I'm going to rephrase that question
2  because I asked it so poorly.  So prior to you
3  asking for his identification from Mr. Bustillos,
4  did the Navajo Refinery employee tell you that
5  Mr. Bustillos had been trespassing on Navajo
6  Refinery property?
7    A.   Not that I recall.
8    Q.   And did you have at the time any
9  understanding as to whether it was legal or not
10  legal for Bustillos to be filming while standing on
11  public property?
12    A.   I know that the refinery does not allow
13  for the recording of the refinery.
14    Q.   Do you have any understanding as to the
15  ability of a private property owner to prevent a
16  person from video recording their property while on
17  public property?
18    A.   I don't know if he was on public property
19  or private property before I got there.
20    Q.   Right.  But do you have any understanding
21  as to whether, for instance, a residential owner can
22  prevent a person on the sidewalk or from the street
23  taking a photograph of a house that they live in?
24    A.   They can't record the inside of somebody's
25  home.

3 (Pages 6 to 9)



*Incident Detail Report*
APD180002215-001
FULL REPORT PRINTOUT

**ARTESIA POLICE DEPARTMENT**

Phone: (575) 746-5000
Address: 3300 W Main St, Ste E
Artesia, NM  88210

## Case Report

### Administrative

| | | | | |
|---|---|---|---|---|
| Disposition | Arrest | | Location | 501 E Main St |
| Subject | Concealing identity | | CSZ | ARTESIA |
| Entered On | 9/11/2018 2:02:56 PM | | Location Name | NAVAJO REFINERY |
| Entered By | BAILEY, DAVID | | Call Source | |
| Reported On | 9/11/2018 | | Related Cases | |
| Reporting Officer | BAILEY, DAVID | | Means | |
| Reporting Agency | APD - ARTESIA POLICE DEPARTMENT | | Other Means | |
| Report Type | Crime Report | | Motives | |
| Assisted By | SANCHEZ, MARCIE | | Other Motives | |
| Occurred On (Date and Time) | Tuesday 9/11/2018 12:55:00 PM | | Vehicle Activity | |
| | | | Direction Vehicle Traveling | |
| Or Between (Date and Time) | | | Cross Street | |
| | | | Notified | |

For Exceptional Clearances

| | |
|---|---|
| Clearance Basis | |
| Exceptional Clearance Date | |

### Offense

| | | | | |
|---|---|---|---|---|
| Offense | 30-22-3 - CONCEALING IDENTITY | | Domestic Violence | No |
| Code Section | | | Premises Entered | |
| Crime Against | Society | | Entry | |
| UCR Hierarchy | 26 | | Using | Not Applicable |
| Location Type | Industrial Site | | Weapons | |
| Completed | Yes | | Criminal Activity | |
| Hate/Bias | | | Type Security | |
| | | | Tools | |

**EXHIBIT**
**8**

*Incident Detail Report*
FULL REPORT PRINTOUT

**ARTESIA POLICE DEPARTMENT**

**Offenders**
**Arrestee Name: Bustillos, Albert Jerome**

  

Aliases

| Alias |
| --- |

Addresses

| Address Type | Address | CSZ | County | Country |
| --- | --- | --- | --- | --- |
| Home | 406 1/2 W Church St | Carlsbad, NM 88220 | | USA - United States of America |

Phones

| Phone Type | Phone Number |
| --- | --- |

Emails

| Email Address |
| --- |

| | | | | |
| --- | --- | --- | --- | --- |
| Sex | Male | Teeth | Normal |
| Race | Hispanic | Build | Medium |
| Ethnicity | Hispanic or Latino | Height | 5' 6" |
| DOB | 4/13/1981 | Weight | 175 |
| Age | 37 | Resident | |
| Eye Color | Brown | POB | |
| Hair Color | Black | DLN | 121190966 |
| Hair Style | Straight | DL State | New Mexico |
| Hair Length | Short | DL Country | United States of America |
| Facial Hair | Clean Shaven | SSN | 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 |
| Complexion | Light Brown | | |

Scars, Marks and Tattoos

| SMT | Location | Description |
| --- | --- | --- |

| | |
| --- | --- |
| Attire | |
| Employer/School | |
| Employer Address | |

*Incident Detail Report*
FULL REPORT PRINTOUT

ARTESIA POLICE DEPARTMENT

| | |
|---|---|
| Employer CSZ | |
| Occupation/Grade | |
| MO | |
| Other MO | |

## Arrest Information

| | |
|---|---|
| Arrest For | 30-22-3 - CONCEALING IDENTITY |
| Arrest Number | |
| Arrest Type | Taken Into Custody |
| Armed With | Unarmed |
| Multi-Clearance | Not Applicable |
| Multi-Clearance Offense | |
| FBI Number | |
| State Number | |
| Arrest Date | 9/11/2018 |
| Arrest Location | 501 E Main |
| Date/Time Booked | |
| Booked Location | |
| Date/Time Released | |

| | |
|---|---|
| Released Location | |
| Released By | |
| Release Reason | |
| Held For | |
| Fingerprints | |
| Photos | |
| Miranda Read | |
| Miranda Waived | |
| Number of Warrants | |
| Juvenile Dispo. | |
| Adult Present (Name) | |
| Detention Name | |
| Notified Name | |

Notes

## Victims

### Name:

| | |
|---|---|
| Victim Type | Society/Public |
| Victim of | 30-22-3 - CONCEALING IDENTITY |

#### Aliases

| Alias |
|---|
| |

#### Addresses

| Address Type | Address | CSZ | County | Country |
|---|---|---|---|---|
| | | | | |

#### Phones

| Phone Type | Phone Number |
|---|---|
| | |

#### Emails

*Incident Detail Report*
**ARTESIA POLICE DEPARTMENT**
FULL REPORT PRINTOUT

Email Address

| Sex | |
|---|---|
| Race | |
| Ethnicity | |
| DOB | |
| Age | |
| Eye Color | |
| Hair Color | |
| Facial Hair | |
| Complexion | |
| Height | |
| Weight | |
| Resident | |

| POB | |
|---|---|
| DLN | |
| DL State | |
| DL Country | |
| SSN | |
| Attire | |
| Employer/School | |
| Employer Address | |
| Employer CSZ | |
| Occupation/Grade | |
| Testify | |
| Injury | |

## Offender Relationships

| Offender | Relationship |
|---|---|

Circumstances
Just. Hom. Circ.

## LEOKA Info

Type
Assignment

Activity
ORI-Other Jurisdiction

Notes

## Witnesses

**Witness Name: Martinez, Benito**

Aliases

| Alias |
|---|

Addresses

| Address Type | Address | CSZ | County | Country |
|---|---|---|---|---|
| Home | 710 E 8th | Lake Arthur, NM  88253 | Eddy | USA - United States of |

*Incident Detail Report*
FULL REPORT PRINTOUT

**ARTESIA POLICE DEPARTMENT**

| | America |
|---|---|

### Phones

| Phone Type | Phone Number |
|---|---|
| Mobile | (575) 420-4544 |

### Emails

| Email Address |
|---|

| | |
|---|---|
| Sex | Male |
| Race | Hispanic |
| Ethnicity | Hispanic or Latino |
| DOB | 7/15/1993 |
| Age | 25 |
| Eye Color | Brown |
| Hair Color | |
| Facial Hair | |
| Complexion | |
| Height | 5' 7" |
| Weight | 201 |
| Resident | Resident |

| | |
|---|---|
| POB | |
| DLN | 508527659 |
| DL State | New Mexico |
| DL Country | United States of America |
| SSN | 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 |
| Attire | |
| Employer/School | |
| Employer Address | |
| Employer CSZ | |
| Occupation/Grade | |
| Testify | |

Notes

**Other Entities**

**Properties**

Printed 9/14/2018 12:48 PM

Page 5 of 7

Case Report Number: APD180002215-001

*Incident Detail Report*
FULL REPORT PRINTOUT

**ARTESIA POLICE DEPARTMENT**

### Narrative

At 12:58 hours on 9/11/18, I (Corporal D Bailey) was wearing full patrol uniform displaying my badge of office and driving a marked patrol vehicle in Artesia, Eddy, NM. I responded to 501 E Main in response to a report of suspicious activity. Officers in route were advised there was a male subject walking along the fence of the Navajo refinery and filming the interior of the facility. The male was described as wearing a brown shirt, jean shorts, and a fisherman's type hat.

Cpl. Sanchez (who was also wearing full patrol uniform displaying her badge of office and driving a marked patrol vehicle) arrive before me and made contact with the male subject. Upon my arrival, I observed Cpl. Sanchez speaking with a male subject fitting the given description of the subject in question. The male was also holding a handheld photography/filming rig with a camera, mobile phone, and external phone battery. As I walked behind the male, I could see the camera was still actively filming. Cpl. Sanchez advised me the male subject had refused to identify himself after multiple requests to do so. Cpl. Sanchez had advised the male he was required to do so as he was the subject of our investigation. I proceeded to inform the male again that he was required to identify himself and requested his identification. The male refused and began giving multiple excuses as to why he believed he did not need to comply. I reiterated the reason for my presence and the legal requirement that he identify himself. The male again did not identify himself and continued with his spiel on why he believed he did not need to. I again advised the male that he would be arrested for concealing identity if he did not identify himself, after which I asked again fir his identification. The male refused my third request for identification (and all of Cpl. Sanchez's requests prior to my arrival).

Given the above, I (Cpl. D Bailey) informed the male he was being arrested for concealing identity. The male placed the camera rig on the ground (still actively filming), after which I placed him into double locked handcuffs. While being placed into handcuffs, the male stated that upon his release from jail, he would just return to the refinery and continue to film the facility. Upon search incident to arrest, the male's New Mexico driver's license was located in his left front pocket. The male was identified as Albert Bustillos. After Albert was secured in my patrol vehicle, the camera rig was retrieved for inclusion with Albert's properties at detention. Upon retrieval, the rig was discovered to be actively live streaming to Facebook. The camera and phone were powered down and the rig was secured in the front seat on my patrol vehicle for transport.

I spoke to the reporting party (Benito Martinez), a security guard at Navajo. He told me Albert had been filming the refinery from outside the fence near the southwest entrance. Upon being asked to stop filming and leave the area, Albert proceeded to walk eastbound along the fence line. There are multiple signs along the south fence advising that photography of the facility is not allowed. Benito advised Albert stopped at the southeast gate (gate 12) and reached his camera inside the gate to film the interior of the facility. Benito informed me that since the refinery is a federally protected facility, filming the interior is prohibited. Upon the filming of the interior, law enforcement was contacted.

Upon arrival at the Artesia detention center, Albert refused to give detention staff his social security number, his phone number, or his current address. Albert also stated several additional times, to both myself and detention staff, that he would just return to the refinery again upon his release.

Albert did not have any dependant children in his care, nor did he need any medical treatment.

*Incident Detail Report*
FULL REPORT PRINTOUT

**ARTESIA POLICE DEPARTMENT**

## Officer Narrative

| Case Number: | APD180002215 | Entered On: | 9/11/2018 5:53:31 PM |
|---|---|---|---|
| Subject: | Supplemental Narrative | Entered By: | 725 - SANCHEZ, MARCIE |

### Narrative:

On September 11, 2018, at approximately 1257 hours, I, Corporal M. Sanchez, while wearing my issued duty uniform, in a marked patrol unit, displaying my badge of office, in the City of Artesia, County of Eddy, and State of New Mexico heard dispatch send Corporal D. Bailey to the Navajo Refinery, 501 E. Main. Dispatch advised there was a male subject there recording the refinery.

I drove to the location to be a back-up unit for Corporal Bailey. Dispatch advised the male subject was wearing a brown shirt, jean shorts and a hat. Upon arrival at the location, I found a male subject matching the description given by dispatch talking with a Navajo employee. I could see the male subject had a camera and he appeared to be recording. I made contact with the male subject and he asked for my name and badge number. I gave the male subject my last name and advised him my unit number was 725. I then asked the male for his identification and he advised he was not going to give it to me as he had not broken the law. I asked the male subject for his identification a few more times and he would not provide it. I asked the male subject what he was doing and he advised he was filming and was on public property. The male advised he was a free citizen on public property.

Corporal Bailey arrived on scene and I advised him the male subject was refusing to identify himself. Corporal Bailey began talking with the male and I went to speak with the Navajo employees to ask where on the property the male had been and if they wanted the male subject trespassed. While speaking with the employees, I saw Corporal Bailey had his handcuffs out so I went over to him. Corporal Bailey advised me the male subject was being arrested for concealing ID. Corporal Bailey placed the male subject under arrest and he was taken back to his unit. During a search incident to arrest, an ID was found in the male subject's pocket and it identified him as Albert Bustillos. Corporal Bailey then spoke with Navajo employees. Corporal Bailey later transported Mr. Bustillos to Artesia Detention Center.

### RTF Narrative:

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ALBERT BUSTILLOS,

                              Plaintiff,

 -vs-                         NO:  20-CV-01060-JCH/GJF

THE CITY OF ARTESIA and OFFICER DAVID BAILEY,

                              Defendants.

REMOTE ZOOM DEPOSITION OF DAVID BAILEY

April 29, 2021
1:30 p.m.

PURSUANT TO THE FEDERAL RULES OF CIVIL

PROCEDURE, this deposition was:

TAKEN BY:  JOSEPH P. KENNEDY
           ATTORNEY FOR PLAINTIFF

REPORTED BY:  Jan Gibson, CCR, RPR, CRR
              Paul Baca Court Reporters
              500 Fourth Street, NW - Suite 105
              Albuquerque, New Mexico  87102

**EXHIBIT 9**

Page 22

1    A.   Two statutes and one city ordinance, but
2   yes, three.
3        Q.   All right.  Do you still maintain that you
4   had reasonable suspicion that he was violating any
5   of those crimes?
6    A.   Yes.
7        Q.   Even though at the time when you're
8   detaining -- well, when you're arresting
9   Mr. Bustillos you didn't have those crimes in mind,
10  did you?
11   A.   I did.
12       Q.   So you had the prowling statute, the
13  prowling ordinance in mind when you were detaining
14  Mr. Bustillos?
15   A.   I did.
16       Q.   And you had disturbing the peace in mind
17  when you were detaining Mr. Bustillos?
18   A.   Disturbing the peace as well as trespass
19  and was in the beginnings of the process to
20  determine if there was anything beyond that.
21       Q.   Okay.  You didn't tell Mr. Bustillos that
22  those were the crimes you were investigating, did
23  you?
24   A.   He didn't really give me a chance to.  He
25  wouldn't let me talk.

Page 23

1        Q.   Well, I guess the answer to that is no,
2   you didn't tell him, right?
3        MR. EVANS:  Object to the form.  Go ahead.
4    A.   I attempted to several times and he spoke
5   over me almost every time without allowing me to
6   answer him.
7        Q.   Do you remember listening to your
8   tape-recording of this incident?
9    A.   It's been a little while, but yes.
10       Q.   All right.  You actually go -- the first
11  thing you do is actually go up and talk to Corporal
12  Sanchez, right?
13   A.   Briefly, yes.
14       Q.   All right.  And Sanchez tells you, "He's
15  refusing to identify himself," referring to
16  Mr. Bustillos, right?
17   A.   That's correct.
18       Q.   And you respond, "We definitely can arrest
19  him on that," correct?
20   A.   That's correct.
21       Q.   All right.  What reasonable suspicion did
22  you have that he had committed a crime other than
23  concealing his identity?
24   A.   Trespass and prowling were the two primary
25  ones and a possibility of disturbing the peace.

Page 24

1        Q.   Right.  When you arrived did it look like
2   the peace was disturbed?
3    A.   There was two or three employees that had
4   to be called away from their duties otherwise in
5   order to deal with Mr. Bustillos that couldn't be
6   dealing with their activities, their job duties
7   because they were having to deal with what was going
8   on there, which is sufficient for the disturbing the
9   peace.  Again, had the opportunity presented itself
10  to have gone further with that there could have been
11  more to it once I had the chance to investigate.
12       Q.   Well, I'm asking you about -- I'm
13  restricting my questions now to basically at the
14  point where you arrive, right?  And Sanchez says,
15  "He's refusing to identify himself" and you say, "We
16  definitely can arrest him on that," right?
17   A.   That's correct.
18       Q.   So I'm kind of wondering at that point in
19  time, the objective information you had that
20  Mr. Bustillos had done anything criminal.
21       MR. EVANS:  Object to the form.  Go ahead
22  and answer, if you can.
23   A.   So in the information passed on from
24  dispatch from the original caller was that he was
25  walking along the fronts, between the barricades and

Page 25

1   the fence, which to the best of my knowledge at the
2   time was actually Navajo property all the way to the
3   curb.  And I would have clarified that further
4   before charging that, but at the time that was a
5   likely possibility for trespassing there.
6        Prowling was a very solid candidate for
7   the fact that we had somebody in a confrontational
8   form was there and videotaping enough to the point
9   that the staff felt it necessary to call law
10  enforcement, was walking along in a place where we
11  don't normally ever have any foot traffic and was
12  videotaping a federally protected facility for
13  reasons unknown.
14       So there definitely enough for -- to
15  solidly pursue prowling and at least to further
16  investigate to have suspicion that trespassing had
17  occurred as well.
18       Q.   Well, what happened -- what's your source
19  of information before you walk up to Sanchez?  Where
20  do you get your information?
21   A.   Primarily from dispatch, either the call
22  notes that actually do get entered into CAD as well
23  as the information given to us over the radio.
24       Q.   All right.  So you have a CAD, a
25  computer-aided dispatch, right?

7 (Pages 22 to 25)

Page 42

```
 1   something to Mr. Bustillos, right?
 2        MR. EVANS:  Form and foundation.
 3        A.   They called because they had an issue that
 4   they needed us to come and deal with.  What their
 5   hopeful intent was, I didn't know at the time.
 6        Q.   All right.  Because you didn't ask them,
 7   right?
 8        A.   I didn't get that far.
 9        Q.   All right.  Sanchez is talking to
10   Bustillos and you come up and say, "We can arrest
11   him."  Essentially.  You were talking to Sanchez,
12   right?
13        MR. EVANS:  Form.
14        A.   After I was given the information from
15   Sanchez that he was concealing ID, yes.
16        Q.   Okay.  And Sanchez is not having a problem
17   in any way physically with Mr. Bustillos, was she?
18        MR. EVANS:  Objection, foundation.
19        A.   That I observed, no.
20        Q.   All right.
21        A.   And nothing had gone over the radio as
22   such, so to the best of my knowledge, no.
23        Q.   Could you see any immediacy or need or
24   emergency for you to act immediately as it relates
25   to Mr. Bustillos?
```

Page 43

```
 1        A.   Yes.
 2        Q.   And what was that?
 3        A.   The fact that we have somebody who, in a
 4   confrontational manner, was there at the property in
 5   an area that we don't normally have people, either
 6   pedestrian traffic or for that matter filming, that
 7   was confrontational enough with the staff enough to
 8   call us there.
 9        When I get there I see the subject that
10   very clearly matches the description that was given
11   to the dispatchers and that that person is still
12   there actively -- actively filming and actively
13   arguing with officers or with Corporal Sanchez.
14        Q.   Well, actively filming is a First
15   Amendment right on public property, right?
16        A.   I understand that.
17        Q.   Arguing with a police officer on public
18   property is a First Amendment right, right?
19        A.   To an extent.
20        Q.   All right.  So he's there exercising his
21   First Amendment rights, correct?
22        MR. EVANS:  Form and foundation.  Go
23   ahead.
24        A.   I don't know what he's doing at this
25   point.
```

Page 44

```
 1        Q.   All right.  You said that he was -- you
 2   said that he had been confrontational with Navajo
 3   employees.
 4        A.   That's presumably why he would have been
 5   called upon -- why they would have called.
 6        Q.   All right.  You're making that inference,
 7   right?
 8        A.   We received a call.
 9        Q.   Right.
10        A.   Filming.  There's lots of time when people
11   stop by, film, take pictures.  Staff may make
12   contact with them, ask them to please stop and leave
13   and they comply.
14        Q.   That happens lots at Navajo?
15        A.   It happens -- I wouldn't say lots.  We do
16   -- once in a while we do get calls asking us to come
17   talk with somebody or whatnot, but we, generally
18   speaking, from talking with the staff after the
19   fact, normally people just head on their way.  They
20   don't get confrontational with the staff.
21        Q.   Right.  But there's nothing unlawful about
22   getting confrontational with staff, is there, on a
23   public place?
24        A.   So given what I had at the time, I don't
25   know if it happened on the public roads or if it was
```

Page 45

```
 1   on the property.
 2        Q.   No, no, as he's standing there, he's being
 3   confrontational but he's not committing any crime
 4   that you can see when you walk up.
 5        MR. EVANS:  Objection to form.
 6        A.   I'm not sure what relevance that has to
 7   how we conduct an investigation.
 8        Q.   It doesn't have any relevance assessing
 9   the person you're there investigating as to how you
10   go about your investigation?  Is that what you're
11   saying, Officer, Corporal?
12        A.   No.
13        Q.   Corporal, is that what you're saying?
14        A.   Are you going to let me talk?
15        Q.   No, I'm going to ask a question.  Are you
16   saying that the physical cues that a person gives
17   off when you walk up doesn't have anything to do
18   with your investigation?  Is that what you're
19   saying?
20        A.   No.
21        Q.   No, you don't say that?
22        A.   That's not what I'm saying.
23        Q.   Okay.  Was there anything about his
24   physical cues that gave you the sense that he was
25   going to batter Corporal Sanchez?
```

12 (Pages 42 to 45)

Page 50

1    Q.   Unless there's aggravating factors, such
2  as potential stalking and things like that, right?
3    A.   Right.
4    Q.   I mean, looking back on it, can you see in
5  any way what Mr. Bustillos was doing was a protest
6  against Navajo Refinery?
7       MR. EVANS:  Objection, form and
8  foundation.
9    A.   I -- I can't speculate as to what his
10  intent was.  I mean, other than it was very
11  obviously clearly done on 9/11, on the anniversary
12  of 9/11, but outside of that I don't know what his
13  intent was.
14    Q.   Well, what does 9/11 have to do with it?
15  How is that relevant?
16    A.   The fact that this was a federal facility
17  where he chose to go and do his confrontational
18  videoing and whatnot to elicit a response from law
19  enforcement was done on the anniversary of the 9/11
20  attacks on the World Trade Center.
21       I mean, I don't know that one had anything
22  to do with the other but it's something that is kept
23  in mind on those days when we have incidents come
24  up.  Any time that September 11th rolls around and
25  we're on shift, we are always on kind of a little

Page 51

1  bit extra heightened alert to kind of watch for
2  things out of the ordinary, which this definitely
3  was.
4    Q.   Well, 9/11 is not a Suspension Of The
5  Constitution holiday, is it?
6       MR. EVANS:  Object to the form.
7    A.   I never said such, no.
8    Q.   No.  So, I mean, people's constitutional
9  rights are as good on 9/11 as they are on 9/10 or
10  9/12, correct?
11    A.   That's correct.
12    Q.   And you said again it's a federal
13  facility.  It's not a federal facility, though, is
14  it?
15       MR. EVANS:  Object to form, go ahead.
16    A.   It's privately owned, yes, but to my
17  understanding it does have federal protections
18  because of the nature of the facility.
19    Q.   All right.  What type of training have you
20  had in terrorism activity in the City of Artesia?
21    A.   Nothing specific as far as terrorism.
22    Q.   Okay.
23    A.   You know, academy-type training and
24  whatnot, but mostly it's like most any other day.
25  We're just looking for behavior that's out of the

Page 52

1  ordinary.
2    Q.   Have you ever -- did you ever -- let me
3  ask you this about the research you did.  What
4  research platform did you use on the legal research?
5    A.   Mostly internet-based.
6    Q.   Okay.  Prior to the magistrate court
7  trial, did you consult with any other law
8  enforcement officers about the legal issues that you
9  researched?
10    A.   Perhaps those on shift with me, my
11  sergeant and Corporal Sanchez.
12    Q.   Who is your sergeant?
13    A.   Sergeant Gallegos.
14    Q.   And do you recall what Gallegos said about
15  it, if anything, about the legal issues involved in
16  the prosecution of Bustillos?
17    A.   He didn't have any objections to it, any
18  qualms against it.  I believe I had conversation
19  with him with the case law that I had found and he
20  agreed with what I was planning to set forward.
21    Q.   Okay.  Now, previously when we started the
22  deposition we talked a little bit about your
23  different understanding pre-Bustillos and
24  post-Bustillos as far as the concealing identity
25  statute.  Do you recall that?

Page 53

1    A.   Yes, sir.
2    Q.   All right.  Did you have any conversation
3  with Gallegos to the effect of, "This is what I
4  believed before and this is what I believe now"?
5    A.   Yes.  We've had those conversations.
6    Q.   All right.  What did Gallegos -- how did
7  Gallegos react?  Was it an affirmation that he, too,
8  believed the way you believed before the Bustillos
9  arrest?
10       MR. EVANS:  Objection, form and
11  foundation.
12    A.   I don't remember.
13       MR. EVANS:  Go ahead.
14    A.   I don't remember specifically.  I know
15  we've had those conversations but it's been some
16  time.  At this point I don't remember, you know,
17  what his -- what he spoke to at that point.
18    Q.   All right.  I mean, you don't remember one
19  way or the other whether he was appreciative of the
20  information you gave him or whether he gave you a
21  sense that he already knew that information?
22       MR. EVANS:  Form and foundation.  Go
23  ahead.
24    A.   It was more to the end that appreciative
25  of the fact that I was doing the research to -- that

14 (Pages 50 to 53)

**Page 1**

1  FIFTH JUDICIAL DISTRICT COURT
   COUNTY OF EDDY
2  STATE OF NEW MEXICO

3

4  STATE OF NEW MEXICO,

5      Plaintiff,

6  v.                        Cause No. D-503-LR-2018-00064

7  ALBERT J. BUSTILLOS,

8      Defendant.

9

10         PARTIAL TRANSCRIPT OF PROCEEDINGS

11

12        On the 13th of June 2019, this matter came on for

13 HEARING before THE HONORABLE LISA B. RILEY, Division IX of

14 the Fifth Judicial District.

15        The Plaintiff, STATE OF NEW MEXICO, appeared by

16 Counsel of Record, PATRICK MELVIN, Fifth Judicial District

17 Attorney's Office, 102 North Canal Street, Suite 200,

18 Carlsbad, New Mexico 88220-5750.

19        The Defendant, ALBERT J. BUSTILLOS, appeared in

20 person and by Counsel of Record, JOSEPH P. KENNEDY, Kennedy

21 Kennedy & Ives, 1000 Second Street, Northwest, Albuquerque,

22 New Mexico 87102-2216.

23        At which time the following proceedings were had:

24

25

**Page 2**

1              I N D E X

2                             Page

3  DAVID BAILEY for Plaintiff
     Direct Examination by Mr. Melvin          3
4    Cross-Examination by Mr. Kennedy          18
     Redirect Examination by Mr. Melvin        28

5

6  MARCY SANCHEZ for the Defendant
     Direct Examination by Mr. Kennedy     30
7    Cross-Examination by Mr. Melvin          35
     Direct Examination by Mr. Kennedy     38
8    Re Cross-Examination by Mr. Melvin        39

9

   ARTHUR BUSTILLOS for the Defendant
10   Direct Examination by Mr. Kennedy     41
     Cross-Examination by Mr. Melvin          45

11

12 REPORTER'S CERTIFICATE                     49

13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1  (1:35:20)

2              DAVID BAILEY

3      (having been duly sworn, testified as follows:)

4           DIRECT EXAMINATION

5  BY MR. MELVIN:

6      Q.  Would you please state your name for the record,

7  sir.

8      A.  David Bailey.

9      Q.  And are you currently employed?  Are you

10 currently employed?

11     A.  Yes, sir.

12     Q.  And where are you employed?

13     A.  In the City of Artesia.

14     Q.  And what do you do for the city?

15     A.  Excuse me.  I'm a police officer with the City of

16 Artesia.

17     Q.  And are you a certified police officer?

18     A.  I am.

19     Q.  And how long have you been a certified police

20 officer?

21     A.  Certified since December of '14.  I began -- I

22 was commissioned with the City of Artesia in May of 2013.

23     Q.  Now, I'm going to take you back to September 11th

24 of 2018.  Are you familiar with the Navajo Refinery?

25     A.  Yes, sir.

**Page 4**

1      Q.  And what city, county and state is that in?

2      A.  City of Artesia, County of Eddy and State of

3  New Mexico.

4      Q.  Did you have occasion to respond there?

5      A.  I did.

6      Q.  And can you tell us about that.

7      A.  I was dispatched to a suspicious person call type

8  with regards to a male subject who had been out at the

9  refinery and was --

10         MR. KENNEDY:  Objection, Your Honor.  I'm going

11 to object to hearsay.

12         MR. MELVIN:  And, Your Honor, this goes to why

13 he's going out there.  And there was a (inaudible), which I

14 don't believe is appropriate, but it also addresses the

15 basis for the future actions.  But it's not being offered

16 for the truth of the matter asserted, what was said.  And I

17 would have the Court not to consider it for that reason.

18 But it does explain the officer's mental state and also why

19 he's responding.

20         THE COURT:  So far the witness has not said

21 anything that was hearsay; however, I guess the question is

22 calling for hearsay.  And the Court will overrule the

23 objection, allow it, if it is not for the truth of the

24 matter asserted.  I don't know what he's going to say --

25 but you may answer.

EXHIBIT
**10**

Page 5

1      MR. MELVIN:  And, Your Honor, and just to be
2  clear, I'm not -- I would ask the Court to disregard it for
3  that reason, whatever -- if there is any hearsay, disregard
4  it to weigh in on whether or not there was a violation of
5  the criminal law for that particular reason.
6      A.  Excuse me.  So we were dispatched -- officers
7  were dispatched to Navajo Refinery with regard to a male
8  subject that was at the refinery, allegedly videotaping and
9  walking along, possibly, within the confines of the
10  refinery property itself.
11      We were specifically made aware that the subject
12  was walking along the front fence line between the fence
13  and the barricades, which, to the best of the officers'
14  knowledge at the time, was actually on the property bounds
15  of --
16      MR. KENNEDY:  Could we have foundation for this?
17  I mean, where is he getting this information from, please?
18      THE COURT:  Okay.  I'll ask the state to lay a
19  foundation.
20      MR. MELVIN:  Sure.
21      Q.  (By Mr. Melvin) And where are you receiving this
22  information?
23      A.  From dispatch.
24      Q.  Okay.  So dispatch is (inaudible)?
25      A.  Well, I mean, through -- I'm sorry -- it's

Page 6

1  through the subject's actions -- thank you, sir -- as to
2  the subject's actions, that information was being received
3  from dispatch through --
4      Q.  But who is relaying this information to you?
5      A.  The dispatcher.
6      Q.  The dispatcher is relaying all this information
7  to you?
8      A.  That's correct.
9      Q.  Okay.  And this is the information that you're
10  operating off of?
11      A.  That's correct.
12      Q.  Okay.  And, again, sir, what was that other part
13  of the information in regards to when you mentioned a gate,
14  or something of that nature?
15      A.  That he had initially been at the main gates and
16  had walked along the front fence line over to the -- that
17  would be the east end of the main gated refinery area to
18  where we made contact with him over by one of the office
19  buildings.
20      Q.  Okay.  And when you arrived there, what did you
21  observe?
22      A.  Upon my arrival, the described subject was at
23  that time speaking with Corporal Sanchez, and there was
24  another couple of Navajo employees standing a few yards
25  back, waiting to be spoken to.

Page 7

1      As I drove up and approached, I was informed by
2  Corporal Sanchez that the subject in question was refusing
3  to identify himself.
4      Q.  And what action did you take at that point in
5  time?
6      A.  I went to make contact with the subject.  And
7  given the dispatch information that we had, the presence of
8  the subject there in an area, a part of town where we don't
9  normally have people, don't have foot traffic along the
10  fence line of Navajo, and with there being the possibility
11  of trespassing having occurred, I went to identify the
12  subject who was later identified as Mr. Bustillos.
13      I went to identify the subject again.  And he
14  refused to identify himself, claiming that he didn't have
15  to.  I explained to him our reason for being there, the --
16  the -- the legal basis for my request for his
17  identification and that he was required to identify
18  himself.  And he, two additional times, refused to identify
19  himself in any way.
20      Q.  Okay.  Now, this is, I suppose, going to your
21  state of mind, but why -- why did you ask for his
22  identification?
23      A.  He -- he was the suspect in the investigation
24  that we were looking into.
25      Q.  And what potential crimes were you investigating?

Page 8

1      A.  The -- given the information we had at the time,
2  we were looking at prowling, disorderly conduct --
3      Q.  I'm going to stop you.  And let's go one by one.
4  When you say prowling, is that a New Mexico statute?
5      A.  It is not.  It is a City of Artesia code,
6  municipal code.
7      MR. MELVIN:  And if I may approach the witness,
8  Your Honor.
9      THE COURT:  You may.
10      CORPORAL BAILEY:  Yeah.
11      MR. MELVIN:  That's fine.  I'm handing the
12  witness what's marked as State's Exhibit 1 (inaudible)
13  identification.
14      Q.  (By Mr. Melvin) And, sir, will you review that,
15  State's Exhibit 1, and let me know when you're finished.
16      A.  I'm familiar with it.
17      Q.  And what is it?
18      A.  This is a printout of the city ordinance of
19  prowling, 5-1B-3.
20      Q.  And where did that printout come from?
21      A.  I believe it's provided through Sterling
22  Codifiers, but it's available on the City of Artesia
23  website, artesianm.gov.
24      Q.  And so -- and, I'm sorry -- what is that?
25      A.  This is a printout of the ordinance for prowling,

Page 9

1 the city ordinance.
2          MR. MELVIN:  And, Your Honor, I move State's
3 Exhibit 1 into evidence.
4          MR. KENNEDY:  (Inaudible).
5          THE COURT:  Is there any objection?
6          MR. KENNEDY:  No.
7          THE COURT:  Okay.  State's 1 is admitted.
8      Q.  (By Mr. Melvin, sir, if you will just read
9 that into the record, please, starting with the municipal
10 ordinance number.
11     A.  5-1B-3:  Prowling.  It is unlawful for any person
12 to loiter or prowl in a place, at a time, or in a matter --
13 manner, excuse me -- not usual for law-abiding individuals
14 under circumstances that warrant alarm for the safety of
15 persons or property in the vicinity.  Among the
16 circumstances which may be considered in determining
17 whether such alarm is warranted is the fact that the actor
18 takes flight upon appearance of a police [sic] officer,
19 refuses to identify himself, or manifestly endeavors to
20 conceal himself or any object.  Unless flight by the actor
21 or other circumstances makes it impractical, a peace
22 officer shall, prior to any arrest for an offense under
23 this section, afford the actor an opportunity to dispel any
24 alarm which would otherwise be warranted, by requesting him
25 to identify himself and explain his presence and conduct.

Page 10

1 No person shall be convicted of an offense under this
2 section if the peace officer did not comply with the
3 preceding sentence, or if it appears at trial that the
4 explanation given by the actor was true and, if believed by
5 the police [sic] officer at the time, would have dispelled
6 the alarm.
7      Q.  Okay.  And then -- so you mentioned that you were
8 investigating this as a possibility.
9      A.  Yes, sir.
10     Q.  And what -- what facts was that based upon that
11 you had at that time?
12     A.  At that point, I had been with the Artesia Police
13 Department for over five years.  And through my experience
14 with the department, it is not common to see persons on
15 foot walking around the perimeter, the borders of the
16 Navajo Refinery, at any time of day.  On very rare
17 occasions, we might see somebody pulled over across the
18 street briefly taking photos and then moving on.  But for
19 someone to be on foot, walking along the perimeters of the
20 fence line like that is uncommon, is not typical for those
21 within the community.
22     Q.  And are there other factors there?
23     A.  The fact that we had received a call that there
24 was cause for alarm by security personnel and other Navajo
25 personnel.

Page 11

1      Q.  Okay.  And is that the extent of it, or are there
2 other factors, as well, in your opinion -- in your mind?
3 I'm sorry.
4      A.  Well, again, like I said, whether -- day or
5 night, it's not normal to see persons there, so that -- the
6 police or time was substantiated within that.  The manner
7 in which the person was acting that -- that caused alarm to
8 cause security personnel to take action and come away from
9 their other duties and, to me, gave sufficient reasonable
10 suspicion to investigate prowling.
11     Q.  When you first arrived there, do you recall if
12 there were security personnel present?
13     A.  There was.
14     Q.  Okay.  Do you recall how many?
15     A.  I know there was -- when I first arrived, there
16 was -- there was at least two personnel.  I don't know if
17 they were both security.  But there were at least two
18 Navajo personnel.  And I was -- I believe there were
19 eventually up to as many as three, that I recall, that were
20 otherwise called away from their duties.
21     Q.  And the day of this, do you recall the date?
22     A.  The date?  September 11th, 2018.
23     Q.  Okay.  And if you abbreviate or if you assign
24 that month to a number and then --
25          THE COURT:  I know what it is, Mr. -- Mr. Melvin.

Page 12

1 Sorry.
2      Q.  (By Mr. Melvin) And what other crimes did you
3 believe that you had a reasonable suspicion for at that
4 time?
5      A.  Excuse me.  Trespassing, (inaudible) the
6 information that we had, and the -- and the -- my belief,
7 my understanding of the boundaries of Navajo, there was
8 reasonable suspicion to investigate the possibility of
9 trespassing.  There was also a reasonable suspicion to
10 investigate the possibility of disorderly conduct.  One of
11 the subsection kind of is more -- more commonly referred to
12 as disturbing the peace.
13     Q.  And so let's go through that with the
14 trespassing.  Tell us about that.
15     A.  Trespass --
16     Q.  (Inaudible) are we talking in reference to the
17 violation of the state trespassing statute or the municipal
18 ordinance?
19     A.  Really, both one and the same.  But typically, I
20 tend to default to state statute in that case.
21     Q.  Okay.
22     Q.  Which would be a person being at a place without
23 permission to be there, whether that be by signs posted,
24 fences erected or by other notification prior to the event
25 happening.

# Energy

# Sector-Specific Plan

2015







# 2   SECTOR OVERVIEW

The Energy Sector consists of widely-diverse and geographically-dispersed critical assets and systems that are often interdependent of one another. This critical infrastructure is divided into three interrelated segments or subsectors—electricity, oil, and natural gas—to include the production, refining, storage, and distribution of oil, gas, and electric power, except for hydroelectric and commercial nuclear power facilities and pipelines. The Energy Sector supplies fuels to the transportation industry, electricity to households and businesses, and other sources of energy that are integral to growth and production across the Nation. In turn, it depends on the Nation's transportation, information technology, communications, finance, water, and government infrastructures. In 2013, PPD-21 identified the Energy Sector as uniquely critical because it provides an essential function across virtually all critical infrastructure sectors.

In the United States, energy assets and critical infrastructure components are owned by private, Federal, State, and local entities, as well as certain energy consumers, such as large industries and financial institutions (often for backup power purposes). The Energy Sector is subject to regulation in various forms as they are often overseen under numerous jurisdictions. The complex operating structure, in addition to the evolving threat and risk environment, make it challenging to protect and secure the sector's critical infrastructure.

PPD-21 directed the national effort in the security and resilience of critical infrastructure to take an integrated, holistic approach to reflect the infrastructure's interconnectedness and interdependency as well as evolving risks. The NIPP 2013 and Energy Sector goals, which are discussed in the following section, reflect that approach.

## 2.1   Vision, Goals, and Priorities

In 2005, Energy Sector partners developed the sector vision and goals through a collaborative process between the two Subsector Coordinating Councils (SCCs) and the Government Coordinating Council (GCC). The Energy Sector vision and goals have always aligned with and supported the NIPP critical infrastructure security and resilience goals. During the NIPP 2013 development process, representatives from all critical infrastructure sectors, including Energy, closely collaborated to develop the revised national critical infrastructure goals. As a result, in 2014, the Energy Sector has adopted the national critical infrastructure goals as its sector goals. Table 2-1 provides the national vision and goals for critical infrastructure security and resilience, as well as the key priorities for the two Energy Subsectors which contribute to achieving the national goals. (See Appendix A for a cross-walk between the subsector priorities and the joint national priorities.)

Table 2-1: National and Energy Sector Critical Infrastructure Vision and Goals

| VISION STATEMENT |
|---|
| A Nation in which physical and cyber critical infrastructure remain secure and resilient, with vulnerabilities reduced, consequences minimized, threats identified and disrupted, and response and recovery hastened. |

| National and Energy Sector Critical Infrastructure Goals |
|---|
| • Assess and analyze threats to, vulnerabilities of, and consequences to critical infrastructure to inform risk management activities.<br>• Secure critical infrastructure against human, physical, and cyber threats through sustainable efforts to reduce risk, |

## 2.1.1 Electricity Subsector Risks and Threats

Many organizations conduct a wide variety of risk assessments of the Electricity Subsector. For example, the North American Electric Reliability Corporation (NERC) assesses risks in terms of the potential impact to the reliability of the bulk power system (i.e., did an event result in the loss or interruption of service to customers?), while private companies and utilities examine risks and threats as they relate to the operational and financial security of each company (i.e., could a threat negatively impact the company's financial health?). Based on a review by some of the largest U.S. electric utilities (in terms of revenue) as well as the analysis by NERC, a wide variety of issues were considered threats in the Electricity Subsector.[2] Despite the differences in what constitutes risk, the Electricity Subsector identified several issues as the key risks and threats to its infrastructure and/or continuity of business in 2012 and 2013:

- Cyber and physical security threats;
- Natural disasters and extreme weather conditions;
- Workforce capability ("aging workforce") and human errors;
- Equipment failure and aging infrastructure;
- Evolving environmental, economic, and reliability regulatory requirements; and
- Changes in the technical and operational environment, including changes in fuel supply.

     

## 2.1.2 Oil and Natural Gas Subsector Risks and Threats

The Oil and Natural Gas Subsector, particularly the oil industry, faces a diverse risk landscape due to its worldwide geographic presence, the hazardous and evolving exploration, production, and operating conditions, as well as the various domestic and in some cases foreign regulatory jurisdictions under which it operates. Based on a survey of the 100 largest U.S. exploration and production companies, the following were identified as key risks the oil and natural gas industry faced during 2012:[3]

- Natural disasters and extreme weather conditions;
- Regulatory and legislative changes—including environmental and health—as well as increased cost of compliance;
- Volatile oil and gas prices and demands;
- Operational hazards including blowouts, spills and personal injury;
- Disruption due to political instability, civil unrest, or terrorist activities;
- Transportation infrastructure constraints impacting the movement of energy resources;

---

[2] "ERO Reliability Risk Priorities RISC Recommendations to NERC Board of Trustees," NERC, October, 2014, http://www.nerc.com/comm/RISC/Related%20Files%20DL/ERO%20Reliability%20Risk%20Priorities%20%20RISC%20Updates%20and%20Recommendations%20-%20October%202014%20r1.pdf (accessed January 20, 2014); State of Reliability 2014, NERC, May 2014, http://www.nerc.com/pa/RAPA/PA/Performance%20Analysis%20DL/2014_SOR_Final.pdf (accessed September 9, 2014).
[3] These risks were identified in the 2012 SEC 10-K filings of the largest 100 U.S. oil and natural gas exploration and production companies. See 2013 BDO Risk Factor Report for Oil and Gas Businesses, June 0213, http://www.lumsdencpa.com/documents/OilGasRiskFactorReport2013June.pdf (accessed June 3, 2014).

# 4 SECTOR EFFORTS TO ACHIEVE NATIONAL VISION AND GOALS

In the Energy Sector, critical infrastructure security and resilience goals and priorities are developed and achieved through a collaborative effort between the industry and the government. As discussed in Section 2, these goals include assessing security risks and threats, securing critical infrastructure from all hazards, enhancing critical infrastructure resilience, sharing information, and promoting learning and adaptation. There are numerous activities and programs that support these goals, developed and maintained by a wide variety of public and private organizations. Because the vast majority of energy infrastructure is owned and operated by the private sector, the Energy Sector security and resilience efforts are a shared responsibility between the public and private sectors. This section highlights some of the approaches and efforts that are underway in the Energy Sector to help achieve the national critical infrastructure security and resilience goals.

## 4.1 Risk Management

The Energy Sector has extensive, in-depth experience in risk management, to enhance the security posture of its critical infrastructure that consists of highly diverse assets, systems, functions, and networks. To address such diverse assets that span the Nation, various risk assessment methods are applied—many of which are tailored to a specific segment of the sector (e.g., electricity, oil, natural gas, or their system components). The industry has responded to the increased need for enterprise-level security efforts and business continuity plans, and continues to assess the security vulnerabilities of single-point assets such as refineries, storage terminals, and power plants, as well as networked features such as pipelines, transmission lines, and cyber systems. In addition, the Energy Sector has methodologies that are being used to assess risks at the system and the sector levels, as well as some with broader applicability that extends across multiple critical infrastructure sectors. This section briefly discusses the various risk assessment approaches that exist in the Energy Sector, as well as some of the key evolving risks facing the sector and the risk management efforts to manage those risks.

### 4.1.1 Risk Assessment

A broad range of methods are used by the Energy Sector to assess risk, which include the international scope of the sector's assets, supply chains, and products. Many energy companies are global and have extensive experience in dealing with a wide variety of natural and manmade threats. This experience has resulted in effective ways to prioritize infrastructure protection and resilience investments based on risk. It has also highlighted the importance of interdependencies within the sector as well as across other critical infrastructure sectors.

It is not only a common business practice, but also a mission of individual owners and operators to ensure the security and protection of their own assets. For that reason, as part of everyday operation, they develop and apply facility and system risk assessment methodologies. Asset owners and operators also prioritize their assets for protection and plan for possible restoration and recovery from anticipated threats. In addition to the owners and operators' risk management approaches, the Energy Sector employs risk assessment

> **Goal:**
>
> *"Assess and analyze threats to, vulnerabilities of, and consequences to critical infrastructure to inform risk management activities."*

# 5  RESEARCH AND DEVELOPMENT PRIORITIES

R&D is a key source of innovation and productivity for the Energy Sector. The equipment and systems used to extract, refine, transport, generate, and securely deliver energy are among the most technologically sophisticated of any sector and have long been faced with the challenge of providing high levels of productivity and reliability against weather and other physical threats. While increased use of automation, IT, telecommunications, and other electronically-enabled devices are helping these systems to become more efficient and resilient, they also create vulnerability to malicious and unintentional cyber threats.

Federal R&D investments are available across government agencies and are, for the most part, coordinated with relevant investment of the private sector as part of an effective and robust national R&D strategy. DOE works with DHS and other funding agencies to highlight sector R&D needs and help identify priorities in cooperation with sector partners. In particular, Federal R&D seeks to fill gaps and stimulate private investment.

Maintaining and improving the resilience and security of the critical energy infrastructure is a shared responsibility among government entities and energy owners and operators.[52] In addressing these challenges, energy owners and operators work closely with governments, national laboratories, universities, industry organizations, and other key stakeholders to drive technological innovation throughout the sector.

## 5.1  R&D for Resilience

One of the key goals of R&D in the Energy Sector is to increase all-hazards, infrastructure resilience. Specifically to natural disasters, the objective is to reduce the social consequences as expressed in terms of impact to quality of life, economic activity, and national security, beyond the impact to the energy system performance itself. As the Nation's energy infrastructure is mostly owned and operated by the private sector, and because the Nation's economy and security depend on reliable supply of energy, R&D for energy infrastructure resilience is a shared responsibility. Thus partnerships across all levels of government and the private sector are required for the life cycle of R&D, from planning and development to implementation.

The Energy Sector has held collaborative activities across government agencies and the private sector in assessing resilience and evaluating the R&D needs and opportunities. The NIPP 2013 clearly lays out a Call to Action consisting of 12 activities identified collaboratively by government and the private sector. The Call to Action is intended to guide efforts to achieve national goals to enhance national critical infrastructure security and resilience. These activities build upon partnership efforts, innovate in managing risk, and focus on outcomes. Call to Action #10 hones in on R&D and directs the Federal Government to take into account the evolving threat landscape, annual metrics, and other relevant information to identify priorities and guide R&D requirements and investments. Areas of interest include improving the security of cyber technology, enhancing modeling capabilities of incident and threat scenarios (including cascading effects cross sectors), incentivizing cybersecurity investments, and designing features that strengthen all-hazards security and resilience. Understanding and addressing interdependencies is important for the Energy Sector because it serves as a

---

[52] The White House, "Presidential Policy Directive -- Critical Infrastructure Security and Resilience," PPD-21, http://www.whitehouse.gov/the-press-office/2013/02/12/presidential-policy-directive-critical-infrastructure-security-and-resil (accessed December 1, 2014).

# Columbia Journalism Review.

# Homeland Security photography alert is 'a seed of fear'

**PHOTOJOURNALISTS, BEWARE**: The US Department of Homeland Security has its eyes on you. The agency tweeted Monday:



Such expansive language is problematic under the First Amendment. "When you look at what DHS identifies as the signs [and objects] of suspicious photography—'personnel, facilities, security features, or infrastructure'—it basically leaves squirrels as the only thing that's safe to photograph," says Frank LoMonte, executive director of the University of Florida's Brechner Center for Freedom of Information. "That's a pretty breathtakingly broad inventory."

LoMonte says a chilling effect often occurs when police show up and question a photographer for simply making pictures, even if no arrest or charges follow. "Being forced to justify why you're outside of a federal building with a camera is intimidating," he says.

**Related: You have a right to remain recording (https://archives.cjr.org/the_news_frontier/you_have_a_right_to_remain_rec.php)**




# COUNTER TERRORISM GUIDE

FOR PUBLIC SAFETY PERSONNEL





EXHIBIT

13

   

THE JOINT COUNTERTERRORISM ASSESSMENT TEAM (JCAT) CONSISTS OF STATE, LOCAL, TRIBAL, AND TERRITORIAL FIRST RESPONDERS FROM AROUND THE US AND FEDERAL INTELLIGENCE ANALYSTS FROM THE DEPARTMENT OF HOMELAND SECURITY (DHS), FEDERAL BUREAU OF INVESTIGATION (FBI), AND NATIONAL COUNTERTERRORISM CENTER (NCTC) WORKING TO ENHANCE INFORMATION SHARING BETWEEN  FEDERAL, STATE, LOCAL, TRIBAL, TERRITORIAL, AND PRIVATE-SECTOR PARTNERS AND IMPROVE PUBLIC SAFETY. ADDITIONAL INFORMATION REGARDING THE JCAT MAY BE FOUND ON WWW.NCTC.GOV.

# REPORTING SUSPICIOUS ACTIVITY

> **"W**HETHER A PLAN FOR A TERRORIST ATTACK IS HOMEGROWN OR ORIGINATES OVERSEAS, IMPORTANT KNOWLEDGE THAT MAY FOREWARN OF A FUTURE ATTACK MAY BE DERIVED FROM INFORMATION GATHERED BY STATE, LOCAL, AND TRIBAL GOVERNMENT PERSONNEL IN THE COURSE OF ROUTINE LAW ENFORCEMENT AND OTHER ACTIVITIES."

NATIONAL STRATEGY FOR INFORMATION SHARING
OCTOBER 2007

**THE NATIONWIDE SUSPICIOUS ACTIVITY REPORTING (SAR) INITIATIVE (NSI)** is a joint collaborative effort by DHS, FBI, and state, local, tribal, and territorial law enforcement partners. This initiative provides law enforcement with another tool to help prevent terrorism and other related criminal activity by establishing a national capacity for gathering, documenting, processing, analyzing, and sharing SAR information.

Online SAR Training for Law Enforcement and Hometown Security Partners: the NSI training strategy is a multifaceted approach designed to increase the effectiveness of state, local, and tribal law enforcement and public safety professionals and other frontline partners in identifying, reporting, evaluating, and sharing preincident terrorism indicators to prevent acts of terrorism. The SAR Line Officer Training and each sector-specific

SAR Hometown Security Partners Training discuss how to report identified suspicious activity to the proper authorities while maintaining the protection of citizens' privacy, civil rights, and civil liberties.

Online training is available on the NSI website (http://nsi.ncirc.gov/training_online.aspx) and includes:

- Scenarios that illustrate the benefit and importance of SAR

- Descriptions of SAR-related behaviors and indicators

- A certificate of completion

# INDICATORS OF SUSPICIOUS ACTIVITY

ONE OR MORE OF THESE INDICATORS COULD SIGNAL SUSPICIOUS ACTIVITY, ALTHOUGH EACH SITUATION MUST BE INDEPENDENTLY EVALUATED. WHEN THE BEHAVIOR OR ACTIVITY INVOLVES BEHAVIORS THAT MAY BE LAWFUL OR IS CONSTITUTIONALLY PROTECTED ACTIVITY, THE INVESTIGATING LAW ENFORCEMENT AGENCY WILL CAREFULLY ASSESS THE INFORMATION AND GATHER AS MUCH INFORMATION AS POSSIBLE BEFORE TAKING ANY ACTION, INCLUDING DOCUMENTING AND VALIDATING THE INFORMATION AS TERRORISM-RELATED AND SHARING IT WITH OTHER LAW ENFORCEMENT AGENCIES.

## POTENTIAL CRIMINAL OR NONCRIMINAL ACTIVITIES REQUIRING ADDITIONAL INFORMATION DURING INVESTIGATION

***ELICITING INFORMATION:*** Questioning individuals at a level beyond mere curiosity about particular facets of a facility's or building's purpose, operations, security procedures, etc., that would arouse suspicion in a reasonable person.

***TESTING OF SECURITY:*** Interactions with or challenges to installations, personnel, or systems that reveal physical, personnel, or cyber security capabilities.

- Unscheduled deliveries of materials or equipment.

- Unattended or unauthorized vessels or vehicles in unusual or restricted areas.

- Overt testing of security measures or emergency response.

**RECRUITING:** Building operations teams and contacts, personnel data, banking data, or travel data.

**OBSERVATION/SURVEILLANCE:** Demonstrating unusual attention to facilities, buildings, or infrastructure beyond mere casual or professional (e.g., engineers) interest such that a reasonable person would consider the activity suspicious. Examples include observation through binoculars, taking notes, or attempting to measure distances.

**PHOTOGRAPHY:** Taking photos or videos of facilities, buildings, or infrastructure in a questionable manner that would arouse suspicion in a reasonable person. Examples include taking pictures or video of infrequently used access points, personnel performing security functions (patrols, badge/vehicle checking), or security-related equipment (perimeter fencing, security cameras), etc. All reporting should be done within the totality of the circumstances.

**MATERIALS ACQUISITION/STORAGE:** Procurement of unusual quantities of possible IED materials, such as cellphones, pagers, fuel, or timers, and/or explosive precursors, such as fertilizers, fuels, or acids, such that a reasonable person would suspect possible criminal activity.

**9**