**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**ALBERT BUSTILLOS,**

       **Plaintiff,**

v.                                         **No. 20-CV-1060-JCH-GJF**

**THE CITY OF ARTESIA, and**
**OFFICER DAVID BAILEY,**

       **Defendants.**

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT

COMES NOW Plaintiff, by and through counsel, The Kennedy Law Firm, P.C. (Joseph P. Kennedy), and hereby responds to Defendants' Motion for Summary Judgment and Memorandum in Support as follows:

### INTRODUCTION

Albert Bustillos ("Bustillos") was filming the operations of a serial polluter, Navajo Refinery, in the City of Artesia, NM, from a public sidewalk. Because of Navajo Refinery's repeated abuse of the Clean Air Act in releasing carcinogenic benzene into the community, the activities of Navajo Refinery are of public interest. Bustillos was not boisterous, not profane and threatened no one. There was nothing that Bustillos did that was unlawful. He captured on film what any member of the public could see with their own eyes.

When Navajo Refinery employees confronted Bustillos and asked him to stop, Bustillos repeatedly told the employees he was on public property and had a right to film from public property. No Navajo Refinery employee ever accused Bustillos of trespassing. Indeed, the employee who called dispatch was careful to tell the dispatcher that Bustillos was outside the refinery. Dispatch made no mention of any trespass.

Artesia Police Corporal Marcie Sanchez of the City of Artesia police department arrived first. She admitted in deposition that she could see no crime that was committed or was being committed. No Navajo Refinery employee had accused Bustillos of trespassing. Artesia Police Corporal David Bailey arrived shortly after Sanchez. Sanchez told Bailey, upon his arrival, that Bustillos was refusing to identify himself. Immediately, Bailey said that they could arrest him for that. After a short dispute with Bustillos about whether he had a legal duty to identify himself, Bailey placed Bustillos under arrest and charged him with Concealing Identity. After the arrest of Bustillos, the officers conducted no investigation related to trespass or to any alleged terrorist activity of Bustillos. A state district court acquitted Bustillos of the charge of concealing identity.

## RESPONSE TO STATEMENT OF ALLEGED UNDISPUTED FACTS

1 – 6.   Plaintiff admits.

7.      Plaintiff denies as incomplete. Plaintiff has attached the full transcript of the 911 call. Most material, Martinez states that Bustillos was outside the refinery. [Transcript of Audio Recording 2018-09-11_12.52.56_Ch2 (2) at 2:20-22, attached as **Exhibit 1**]

8 – 15. Admitted.

16.     Plaintiff denies he was arguing with Corporal Sanchez. Plaintiff admits he refused to provide identification and stated his belief that he was not legally required to provide identification.

17 – 21. Admitted.

22.     Denied that Plaintiff talked over Corporal Bailey. The exhibit speaks for itself.

23.     Plaintiff admits he refused to provide identification.

24.     Corporal Bailey arrested Plaintiff for concealing identity.

25.     Denied as immaterial. Corporal Bailey's subjective beliefs are immaterial. Further,

Corporal Bailey had zero training in "terrorism activity in the City of Artesia." [Deposition of Corporal David Bailey at 51:19-25 and 52:1, attached as **Exhibit 2**]

26.     Denied as immaterial. There are multitudes of legal, human behavior that may be out of the ordinary to Corporal Bailey. "Out of the ordinary" is not a relevant legal standard.

27.     Denied as immaterial. It is undisputed that Bustillos was in a public area. [**Id**. at 27:24-25 and 28:1-3]

28.     Denied as immaterial. The desire of a private corporation, especially a polluter, to use law enforcement to protect their private interests is also an explanation as to why Navajo Refinery employees called law enforcement.

29.     Denied. Corporal Bailey had no information that Bustillos was being confrontational. Any alleged inference has no basis in fact.

30.     Denied. Bailey's belief that somehow a company would own a sidewalk is contrary to law and contrary to all human experience. [See Affidavit of Albert Bustillos at ¶¶ 3-6, attached as **Exhibit 3**]

31.     Denied as immaterial. What the Navajo Refinery employees told Bustillos was not information that Corporal Bailey had when he approached Bustillos.

32.     Denied as immaterial and non-sensical. "A federally protected facility" has no meaning in law or in common English usage. The federal government owns property, which it protects. Nothing in the material attached to the motion lends itself to a description that Navajo Refinery enjoys "federal protection" to a greater extent than any other business or individual present in the United States enjoys.

33 – 40. Plaintiff denies the "factual material" described in paragraphs 33-40 as immaterial as none of the information offered was known to Corporal Bailey at the time he pulled up and

arrested Bustillos. Most interesting though is the citation to the tweet of the Department of Homeland Security about reporting people for photographing public buildings and the legitimate concern of the Columbia Journalism Review about the impact on first amendment activities. The article wisely raises concerns about the scope of the suspicious activity as well as the likelihood that local law enforcement will intimidate people by simply asking them to justify their photography. Local law enforcement officers "are much more likely to arrest people on an insignificant misdemeanor charge, such as loitering, than federal intelligence agents are." Like the article, Bustillos would like to know where the data is that supports an inference that "terrorists are prone to stand on public sidewalks conspicuously filming their intended targets 'in a prolonged manner.'"

## **MATERIAL FACTS**

1. Albert Bustillos is an independent journalist. [**Exhibit 3** at ¶ 1]

2. Bustillos films and takes pictures of various locations of public interest as potential news stories.

3. On September 11, 2018, Albert Bustillos went to film the outside of the Navajo Refinery for a public interest story he was working on. [**Id.** at ¶ 2]

4. Albert Bustillos was streaming live on YouTube. [**Id**. at ¶ 7]

5. Bustillos is aware of stop and identification laws and has read various court opinions related to a citizen's duty to identify himself.

6. Bustillos arrived at the Navajo Refinery and began filming from a public place. Bustillos never entered private property. [**Id**. at ¶ 13]

7. Bustillos knew where public property was and remained on public property. [**Id**. at ¶ 4]

8. Bustillos never walked between the barriers and the fence. [**Id**.]

9.   The area between the barriers and the fence is clearly a walkway.

10. Corporal Bailey was not aware of the applicable legal standard when he arrested Bustillos. [**Exhibit 2** at 20: 1-25]

11. Bailey believed that he could demand identification from anyone at the scene of any location to which he is dispatched. [**Id**.]

12. Now, Bailey understands that he needs to have reasonable suspicion that a person committed a predicate crime before he can demand identification from a person at the scene of a call. [**Id**. at 18:7-14]

13. After Bailey arrested and charged Bustillos, he took the initiative to research caselaw and read applicable cases in preparation for the criminal prosecution of Bustillos. [**Id**. at 16:4-25 and 17:1-17]

14. Prior to the arrest of Bustillos, Bailey relied on his academy training in forming his belief about the Concealing Identification law. [**Id**. at 20:1-13]

15. Bailey then researched the possible crimes for which he had reasonable suspicion as the predicate criminal act to justify his demand of identification from Bustillos. [**Id**. at 21:12-18]

16. Bailey agrees that his interactions with Bustillos resulted in his having a better understanding of caselaw as it relates to Concealing Identification and that he is a better police officer as a result of it. [**Id**. at 21:1-11]

17. Bailey contends that the "disturbing the peace" that Bustillos was suspected of was the fact that "two or three employees . . . had to be called away from their duties . . . to deal with Bustillos . . . which is sufficient for disturbing the peace." [**Id**. at 24:1-11]

18. Bailey claims that "the information passed on from dispatch from the original caller was that [Bustillos] was walking along the fronts, between the barricades and the fence, which to

the best of my knowledge at the time was actually Navajo property all the way to the curb. And I would have clarified that further before charging that, but at the time that was likely possibility for trespassing there." [**Id**. at 24:23-25 and 25:1-5].

19. Indeed, in the recording of the dispatcher's call to Bailey, there is no mention that Bustillos was walking along the fence line. [Exhibits 5 and 6 to Defendants' Motion for Summary Judgment, Doc. 23]

20. In Bailey's report he relates that dispatch informed him simply that the male was walking along the fence. [Criminal Complaint by Corporal D. Bailey attached as **Exhibit 4**]

21. However, the caller to dispatch told the dispatcher that Bustillos was filming on the other side of the street into the refinery. [**Exhibit 1** at 2:18-22]

22. The caller makes no mention to the dispatcher that Bustillos was walking along the front of the property. [**Id**.]

23. The official CAD report states that "[Reporting party advises] that there is a male subject that is filming Navajo. . . . Subject is on the outside of the fence but filming the inside of the refinery yard." [CAD report at p. 3, attached as **Exhibit 5**]. There is no allegation that Bustillos had trespassed. Indeed, the caller is careful to relate that Bustillos is outside the facility. [**Id**.]

24. The CAD notes also that Bustillos is walking eastbound. [**Id**.]

25. The CAD contains no reference to any allegation that Bustillos was walking between the fence and the barricades.

26. Bailey's fellow officer, Corporal Marcie Sanchez, remembered that the dispatch she heard was a complaint from a security guard that a man was filming the refinery and she remembers no other information. [Deposition of Marcie Sanchez at 5:10-19, attached as **Exhibit 6**].

27. Sanchez agreed that the call was a suspicious person filming and that she had "no information one way or another" that Bustillos had been on private property. [Transcript of Pretrial Interview of Corporal Marcie Sanchez at 4:13-20, attached as **Exhibit 7**]

28. Sanchez's police report written near contemporaneously with the event describes that call as "[d]ispatch advised there is a male there recording the refinery." [Supplemental Report of Corporal Marcie Sanchez, attached as **Exhibit 8**]

29. Corporal Sanchez arrived first and asked Bustillos what he was doing and Bustillos responded that he was recording "matters of interest to the public." [**Exhibit 6** at 7:7-12]

30. No Navajo Refinery employee accused Bustillos of trespassing [**Id**. at 9:1-7]

31. At the time Bailey arrested Bustillos, Sanchez had just left to go speak to Navajo Refinery employees about what had happened [**Id**. at 11:13-25 and 12:1-14]

32. Sanchez had no information that Bustillos had been trespassing. [**Exhibit 7** at 4:17-20]

33. Sanchez didn't know whether Bustillos had been trespassing as she did not speak with Navajo Refinery employees. [**Id**. at 5:1-13]

34. Even after his arrest, no one accused Bustillos of trespassing [**Id**. at 6:24-25 and 7:1-23]

35. Immediately upon Bailey's arrival, Sanchez stated "So he's refusing to identify himself." [Transcript of belt tape of Corporal Bailey at 2:6-7, attached as **Exhibit 9**]

36. Bailey's immediate response was: "We can definitely arrest him on that." [**Id**. at 2:8-9]

37. Bailey stated that the crime Bustillos was committing was "failure to identify." [**Id**. at 4:9-12]

38. When Bustillos insisted he did not have to identify himself unless he was committing a crime, Bailey stated Bustillos was filming when "It's clearly posted no photography." [**Id**. at 5:2-13]

7

39. Navajo Refinery is a subsidiary of HollyFrontier, which is a publicly traded company on the New York Stock Exchange, with a stock value of about $5 billion. [finance.yahoo.com/quote/hfc]

40. HollyFrontier activities are a matter of public interest as it has been subjected to multiple lawsuits and regulatory actions for safety violations and for violations of the clean air act. First instance:

a) A report from the Environmental Integrity Project reveals that the Navajo Refinery in Artesia had the second highest level of benzene pollutants for the third quarter of 2019, where monitors at the fence line detected four times the approved level of benzene emissions. [Monitoring for Benzene at Refinery Fence lines at p. 5; https://environmentalintegrity.org/news/refineries-emit-benzene-in-amounts-above-epa-action-levels/]

b) The report states that elevated benzene levels are primarily on the west side of the refinery. The Roselawn elementary school is located 0.2 miles away from the west fence line of the refinery. [Id. at p. 11].

c) The non-profit Good Jobs First reports that HollyFrontier has had over $200,000,000.00 in regulatory fines imposed against it since 2000. [https://violationtracker.goodjobsfirst.org/parent/hollyfrontier, attached as **Exhibit 10**]

d) The EPA entered into a consent decree with HollyFrontier to mitigate pollutants. *USA v. HollyFrontier et al.*, 15-cv-2024; Doc. 2-1 (D.D.C. 11/19/2015)

e) The Albuquerque Journal has reported about the carcinogenic levels of benzene coming from the Navajo Refinery. [https://www.abqjournal.com/2391680/report-high-carcinogen-level-a-public-health-hazard-in-artesia.html, attached as **Exhibit 11**]

## <u>LEGAL ARGUMENT</u>

**Qualified Immunity**

In ordering that the district court enter judgment in favor of plaintiffs in an arrest claim, the Tenth Circuit stated in *Maresca v. Bernalillo Cty*. that probable cause to arrest "is a legal issue that [the Tenth Circuit] review[s] de novo." 804 F.3d 1301, 1310 (10th Cir. 2015) (quoting *United States v. Valenzuela,* 365 F.3d 892, 896 (10th Cir.2004)). Probable cause exists only if, in the

totality of the circumstances, the "facts available to the officers at the moment of the arrest would warrant a [person] of reasonable caution in the belief that an offense has been committed." *Maresca*, 804 F.3d at 1310 (quoting *Beck v. Ohio,* 379 U.S. 89, 96 (1964)). In the civil context, where qualified immunity is raised, the Court asks "whether an objectively reasonable officer could conclude that the historical facts at the time of the arrest amount to probable cause." *Id.* (quoting *Cortez,* 478 F.3d at 1116.) The Tenth Circuit "[a]s a practical matter" determines whether there is "arguable probable cause" for the arrest. *Corona v. Aguilar*, 959 F.3d 1278, 1285 (10th Cir. 2020)

In an unlawful arrest case, the "principal components of a determination of reasonable suspicion or probable cause" will be the events leading up to the stop or search, which is a question of historical fact. *Ysasi v. Brown*, 3 F.Supp. 3d 1088, 1144 (D.N.M. 2014) (citation omitted). But if the "historical facts are admitted" the issue is simply a legal question "whether the facts satisfy the [relevant] statutory [or constitutional] standard." *Id.* When the facts are conceded to the nonmovant at summary judgment, it is ordinarily for the court to decide "[a]s a matter of law, based on the undisputed facts," whether the officer violated the plaintiff's Fourth Amendment rights. *Id.*, *see also Keylon v. City of Albuquerque*, 535 F.3d 1210, 1216 (10th Cir. 2008).

**Concealing Identity**

"No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quoting *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891)). In the Tenth Circuit, the law is clearly established that a law enforcement officer needs reasonable suspicion of a predicate crime before demanding a detained person identify himself. *Keylon*, 535 F.3d at 1216

(citing *Brown v. Texas,* 443 U.S. 47, 52 (1979)); *accord Mocek v. City of Albuquerque*, 813 F.3d 912, 922 (10th Cir. 2015).

The Tenth Circuit recently cited the *Keylon* precedent as providing sufficient notice to an officer in denying qualified immunity. *Corona v. Aguilar*, 959 F.3d 1278, 1284 (10th Cir. 2020) ("to determine whether Plaintiff's arrest comported with the dictates of the Fourth Amendment, we must first consider whether Defendant Aguilar possessed reasonable suspicion that Plaintiff had committed or was committing a crime such that the demand for his ID was lawful."). The *Corona* panel determined that *Keylon* was sufficiently factually similar to put a law enforcement officer on notice of the applicable legal standard. The legal standard was "beyond debate." The Court pointed to the same lack of physical resistance and fighting words in the conduct of the arrestees in *Keylon* and *Corona*. *Corona v. Aguilar*, 959 F.3d at 1286.[1]

Absent any misconduct, "the balance between the public interest and [defendant's] right to personal security and privacy tilts in favor of freedom from police interference." *Brown v. Texas*, 443 U.S. at 52. In *Brown*, two police officers observed Brown and another man walking away from one another in an alley. *Id.* at 48. An area with a high incidence of drug traffic. *Id.* at 49. The officers stopped and asked Brown to identify himself and explain what he was doing. *Id.* at 48. The officers did not suspect Brown of any specific misconduct, nor did they believe he was armed. *Id.* at 49. Brown refused to identify himself. *Id.* Brown was arrested for violating a Texas statute that made it criminal for a person to refuse to give his name and address to an officer "who has

---

[1] The decision from the Northern District of Texas is unpersuasive. *Smith v. Hernandez*, 2020 WL 1643425 (N.D. Tx. 2020) The plaintiff was unable to cite any direct Fifth Circuit decision that was specific enough to put an officer on notice that the detention of a person required reasonable suspicion of a criminal act and that provided a factual precedent where the detained persons had engaged in no boisterous, violent, or disorderly behavior. The District Court stated that general propositions of law were insufficient to put an officer on notice that his conduct was unlawful. In addition, the court denied qualified immunity for a subsequent search. Thus, plaintiff has been unable to appeal the district court's determination.

lawfully stopped him and requested the information." *Id.* Nothing incriminating was found on him. *Id.* When the officers detained Brown and forced him to identify himself, they performed a seizure subject to the requirements of the Fourth Amendment. *Id.* at 50. The Fourth Amendment does not allow stopping and demanding identification from an individual without any basis for believing the presence of criminal activity. *Id.* at 52. Such a stop would risk "arbitrary and abusive police practices," exceeding "tolerable limits." *Id.*; *see also Keylon v. City of Albuquerque*, 535 F. 3d 1210, 1216 (confirming that *Brown* dictates that some underlying crime must pre-date an arrest for concealing identity).

In *Keylon*, an Albuquerque police officer asked Bertha Keylon for the date of birth and address of her son who was a suspect in a felony damage to property investigation. *Id.* at 1214. Bertha Keylon said she did not know. *Id.* The APD officer suspected Bertha was being evasive so he asked for her identification. *Id.* When Ms. Keylon started walking toward her home, the officer said that he needed to see her identification. *Id.* Ms. Keylon said she would get her ID when she was ready. The officer placed Ms. Keylon under arrest for concealing identity. The Tenth Circuit ruled that the district court erred when it failed to enter judgment on Ms. Keylon's claim of wrongful arrest finding that no reasonable police officer could believe that Ms. Keylon's actions constituted resisting, evading, or obstructing. *Id.* at 1217.

*Mocek v. City of Albuquerque*, 813 F.3d 912, 923–24 (10th Cir. 2015), was premised upon reports of disturbance that the plaintiff had created at a location where orderly processing of the travelling public is paramount: "Officer Dilley indicated that Mocek had distracted multiple TSA agents, persistently disobeyed their orders, already caused a "disturbance" (according to the agents on the scene), and potentially threatened security procedures at a location where order was paramount." *Id.* An airport is also a non-public forum from a first amendment perspective. *Id.* at

930.

In *Mocek*, TSA agents accused the plaintiff of causing a disturbance. Here, there were no reports of Bustillos being disorderly. He merely filmed. In *Mocek*, the plaintiff attempted to pass through security, thus engaging with TSA officers. Here, Bustillos merely filmed and did not engage with security officers. They engaged with him. In *Mocek*, the TSA officers were pulled away from duties related to aiding the travelling public to get through security in a timely manner. Here, there is no evidence that the security guards had any other duties to perform. In *Mocek*, the Tenth Circuit found that the officer had reasonable suspicion to investigate disorderly conduct under state law as the officer had an actual report that Mocek was disturbing the peace.

**First Amendment Rights and the Public Forum of a Sidewalk**

Bustillos was filming on a public sidewalk, which is an area, along with streets and parks, that the Supreme Court has long stated is the public forum with the most constitutional protection. *Fenn v. City of Truth or Consequences*, 983 F.3d 1143, 1148 (10th Cir. 2020) (citing *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983)). The government's ability "to limit expressive activity are sharply circumscribed in the public forum." *Perry*, 460 U.S. at 45. To prohibit free expression based on content the state must show that "its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Id*. In contrast, in *Mocek*, the plaintiff was filming in an airport, which is a non-public forum and government restrictions must only be reasonable. *Mocek,* 813 F.3d at 930 (citing *Int'l Soc'y for Krishna Consciousness v. Lee,* 505 U.S. 672, 683, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992)).

Law enforcement officers may not simply detain suspicious people in public areas unless they have reason to believe the person has committed a crime. *Kolender v. Lawson*, 461 U.S. 352, 358, (1983) (citing *Shuttlesworth v. City of Birmingham,* 382 U.S. 87, 90 (1965) (allowing police

officers to detain people on a public sidewalk has the potential to suppress allowable first amendment activities and "implicates consideration of the constitutional right to freedom of movement.")).

In *Shuttlesworth*, 382 U.S. at 90, the Court expressed doubt that an ordinance that criminalized the refusal to obey police orders, especially an order to move from a sidewalk, would pass constitutional muster. The court invoked the concurrence of Justice Black in *Cox v. State of Louisiana*, 379 U.S. 536, 579 (1965) (Black, J. concurring), wherein Justice Black wrote that such an ordinance impermissibly leaves to the "moment-to-moments opinions of a policeman" whether the "views being expressed on the street are provoking or might provoke a breach of the peace." *Shuttlesworth*, 382 U.S. at 90 (citing *Cox supra*).

There is no evidence of trespassing. No one accused Bustillos of trespassing and the space between the fence line and concrete barriers is an obvious pedestrial right of way. [**Exhibit 3** at ¶ 6] A sidewalk is an obvious public right of way. The State gives municipalities the right to create and repair sidewalks. N.M. Stat. Ann. § 3-49-1 (West) and N.M. Stat. Ann. § 41-4-11 (West). The City of Artesia itself recognizes its rights to restrict activity on sidewalks, such as prohibiting blocking sidewalks and prohibiting commercial activity on sidewalks:

> No person, firm, association, corporation or society shall hold or conduct a rummage sale of used and secondhand articles upon the sidewalks or in any public place in the city except an association, society or corporation organized for religious or charitable purposes and not engaged in doing business for profit.

City of Artesia Code 4-3B-2: Use of Public Ways and Property; City of Artesia Code 5-1B-9: Obstructing Movement. [Attached as **Exhibit 12**]

**No Evidence of Loitering or Prowling**

The loitering and prowling ordinance suffers from constitutional infirmness. *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999) (holding loitering statute unconstitutional as it

prohibited innocent, lawful conduct and entrusted too much discretion to the officer on the street as to when to enforce the ordinance); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 168 (1972) (historical review of vagrancy laws and finding that Jacksonville ordinance vague and placed "unfettered discretion" to the officer enforcing the statute); *Lawrence v. Reed*, 406 F.3d 1224, 1232 (10th Cir. 2005) (no qualified immunity for enforcement of "obviously unconstitutional" statute).

What is alarming to a police officer may vary from officer to officer and allows a broad swath of lawful activity in public places to be transformed into unlawful conduct in the hands of a resourceful police officer. In addition, allowing the refusal to identify oneself to enhance a belief that a person is engaging in unlawful activity flies in the face of Supreme Court precedent. *Corona v. Aguilar*, 959 F.3d 1278, 1284 (10th Cir. 2020) (officer cannot use a refusal to identify as sole basis to arrest a person for concealing identity).

More importantly, the activity of filming in public can in no way be fit into any reasonable concept of loitering or prowling. Loitering involves "idleness." *Dunn v. City of Boynton Beach*, 192 F. Supp. 3d 1310, 1318–19 (S.D. Fla. 2016) ("At a minimum, loitering, either innocently or criminally, involves idleness or delay.") (citing Loitering, *Black's Law Dictionary* (10th ed. 2014)); *City of Chicago v. Morales*, 527 U.S. 41, 61 (1999) (for the proposition that a person who is moving cannot be considered to be loitering under any meaning of loitering); *see also Balizer v. Shaver*, 1971-NMCA-010, ¶ 20, 82 N.M. 347, 350 (citing Webster's Third International Dictionary, 1966 for the proposition that loitering involves aimlessness or idleness). The Eighth Circuit found that an officer lacked a basis to detain two people who were walking in the middle of the street under the same loitering and prowling statute. *Fields v. City of Omaha*, 810 F.2d 830, 835 (8th Cir. 1987) (nothing about walking in the street fits into the meaning of "loitering" or

"prowling"). Bustillos was neither loitering nor prowling and no reasonable police officer would believe otherwise. He was fully open about his activity and was actively engaged in filming.

**There Was No Evidence of Disorderly Conduct**

Unlike in *Mocek*, where TSA agents complained of disorderly behavior, there was no complaint about Bustillos' behavior. The crime of disorderly conduct involves "engaging in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct which tends to disturb the peace" N.M. Stat. Ann. § 30-20-1 (West). The conduct must be an act which is likely to cause violence or the breach of the peace by causing "consternation and alarm." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1285 (10th Cir. 2008) (quoting *State v. Doe,* 92 N.M. 100, 583 P.2d 464, 466 (1978)). In *City of Las Cruces v. Flores*, 2020 WL 1845195 (MNCA 2020), the Court of Appeals reviewed the law surrounding disorderly conduct. In *Flores*, the Court returned a concealing identification conviction due to a determination that there was no reasonable suspicion the defendant was engaging in disorderly conduct when he was recording police officers and yelling at them about traffic enforcement. Flores, 2020 WL 1845195 ¶¶ 10-12. There is simply nothing about filming with a cell phone camera from a public place that can be considered disorderly.

Certainly, law enforcement officers are permitted to examine the publicly available view of private property. The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares. *California v. Ciraolo*, 476 U.S. 207, 213 (1986); *United States v. Hatfield*, 333 F.3d 1189, 1197 (10th Cir. 2003).

## CONCLUSION

The legal issues are simple. The factual record is straightforward. Bustillos was benignly

filming a private facility from a public space. Employees from a serial polluter did not want to be filmed. The corporation called the police to do their dirty work. The police got rid of the nuisance. This deprived Bustillos of his First and Fourth Amendment rights.

WHEREFORE, Plaintiff respectfully requests the Court deny Defendants' Motion for Summary Judgment.

Respectfully Submitted,

THE KENNEDY LAW FIRM, P.C.

*/s/ Joseph P. Kennedy*
Joseph P. Kennedy
*Attorney for Plaintiff*
1000 2nd Street NW
Albuquerque, NM 87102
505-244-1400 / F: 505-244-1406
jpk@civilrightslaw.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served upon all parties of record on the day of its filing via the CM/ECF electronic filing system.

*/s/ Joseph P. Kennedy*
Joseph P. Kennedy